Robert S. Edmonds and George S. Robinson, Appellees, v. George Heil and Myrtle G. Heil, Appellants.

Gen. No. 44,060.

500

Opinion filed February 17, 1948. Released for publication March 9, 1948.

VOGEL & BUNGE, of Chicago, for appellants; L. H. VOGEL and FORREST S. BLUNK, both of Chicago, of counsel.

EDMUND M. SINNOTT and JOSEPH F. SHEEN, both of Chicago, for appellees.

MR. JUSTICE SULLIVAN delivered the opinion of the court.

By this appeal defendants, George Heil and Myrtle G. Heil, seek to reverse a judgment for $8,200 entered against them and in favor of Robert S. Edmonds. The defendants filed a separate appeal, Appellate Court General Number 44061 [p. 648, *infra*], from a judgment for $5,500 entered against them and in favor of George S. Robinson. These two appeals have been consolidated for hearing in this court.

A single complaint was filed by the plaintiffs, Edmonds and Robinson, against Florence K. Burnham and her agents, George Heil and Myrtle G. Heil, to recover damages for the destruction of their furniture, fixtures and other personal property as the result of a fire in the building in which plaintiffs resided with their families. The suit was dismissed as to Florence K. Burnham, the owner of the building, for want of service of process. The case was tried before the court and a jury. Two verdicts were returned by the jury, one finding defendants guilty as to the plaintiff Edmonds and assessing his damages at $8,200 and the other finding defendants guilty as to the plaintiff Robinson and assessing his damages at $5,500. The judgments appealed from were entered on the respective verdicts. It is not claimed that the damages awarded are excessive.

Plaintiffs' complaint consisted of two counts. The first count as amended alleged in substance that on or about December 31, 1941, plaintiffs were tenants in the duplex apartment building located at 1205 Hull Terrace, Evanston, Illinois, which property was owned ·by Florence K. Burnham and was maintained, controlled and operated by her through her agents, the defendants, George Heil and Myrtle G. Heil; that the defendants reserved to themselves exclusive control, operation and maintenance of the boiler room in the basement of the building and the heating apparatus therein; and that the defendants were obligated to maintain and operate the building and the appurtenances thereto, including the heating apparatus, in a reasonably safe manner. The complaint then proceeded with the following allegations:

"3. Notwithstanding this duty, and in wilful disregard of the rights of the plaintiffs, the defendants, George Heil and Myrtle G. Heil, were guilty of one or more of the following items of negligence: . . .

"(b) Employed incompetent, negligent help to operate said heating plant and permitted in their employ a person to fire said heating plant who immediately preceding the time and place of the fire in question was under the influence of liquor, and who, immediately preceding the fire, fired the heating plant in an improper and unworkmanlike manner."

Count one of the complaint further alleged that as a result of said negligence the defendants knew or by the exercise of ordinary care could have known that the building in question caught fire and in a short space of time said building and the contents thereof, including the personal property of plaintiffs, were completely destroyed; that the fire occurred about 6 a. m. on January 1, 1942; and that plaintiffs and each of them were exercising due care and caution for the safety and preservation of their property at and prior to the time the fire occurred.

Count two of the complaint, omitting all but the charging part thereof, alleged that "the plaintiffs, and each of them, were in the exercise of due care and caution for the safety of themselves and their property, and for its preservation from injury and harm"; that "notwithstanding the defendants' duty to use due care and caution in the maintenance, operation and control of said heating apparatus and appurtenances, by reason of the defendants' negligent use of materials and apparatus necessary for the task in hand and under its control, and by reason of the defendants' negligent management, operation and care of same, a combustion took place within said basement where said heating apparatus and appurtenances were located, and a conflagration ensued upon said premises"; and that "as a direct and proximate result of said conflagration, the household goods, furniture, wearing apparel, effects and all other property" of the plaintiffs, Robert S. Edmonds and George S. Robinson, "were consumed by fire"; and that "said fire occurred on, to wit: January 1, 1942, at or about the hour of 6:00 A.M."

Defendants' answer admitted the allegation contained in both counts of the complaint that they reserved to themselves exclusive control, operation and maintenance of the boiler room and the heating apparatus therein but denied that they were guilty of negligence as charged in either the first or second count of the complaint.

For a proper understanding of the questions presented for our determination it is necessary to set forth rather fully the salient facts and circumstances shown by the evidence.

For three months immediately preceding the fire Robinson occupied the apartment on the first floor of the building in question as a tenant. He lived there with his wife and two children, a daughter 6 years old and a son 3 years old. Edmonds occupied the second floor apartment as a tenant for about 4 years prior to

the fire. He lived there with his wife and two daughters, one then 20 years old and the other 11 years old. No one lived in the building except Robinson and Edmonds and their families. Both apartments consisted of seven rooms, similarly arranged. The building was on the north side of the street, facing south.

Robinson's living room was in the front or south portion of his apartment. It was about 20 feet long and 20 feet wide. Immediately to the rear or north of the living room was the bedroom of Robinson and his wife. Robinson's bedroom was separated from the living room by a partition. To the rear of his bedroom there was a bathroom, just north of which was his childrens' bedroom. The other rooms in the apartment were north of the childrens' bedroom, the kitchen being at the extreme rear.

The boiler room was in the front or south end of the basement. It extended back about 20 feet from the front wall and was about 30 feet wide. It was separated from the rest of the basement by a wooden partition with a door in the center thereof. This partition, according to Robinson's wife, was "about under" the partition that separated the living room in their apartment from their bedroom. The heating plant was approximately opposite the center of the west wall of the boiler room and about 3 or 4 feet from said wall. It was directly under Robinson's living room, as was most of the boiler room. There was a door in the rear of the building at ground level and immediately inside this door there was a landing. There was an enclosed inside stairway from this landing to the kitchen doors of both apartments and there was a short open stairway from said landing to the basement floor.

Mrs. Robinson testified that "around six o'clock" on the morning of January 2, 1942, she was awakened by noise the janitor made as he was working around the heating plant; that about five or six minutes elapsed from the time she first heard him until she heard the

basement door close; that she then "dozed off" for about 15 minutes, when she "heard the floor cracking . . . and thought it was her little boy coming in"; that when she called and her child did not answer, she "sat up" and saw "fire coming out of the corner of the bedroom . . . on the partition between the living room and the bedroom"; that "there was a lot of flames and smoke" coming from said partition; that she awakened her husband and told him that there was a fire; that she telephoned the fire department, while her husband aroused the children; that they all hurried to the kitchen door, which "was the nearest way out"; that when they opened the kitchen door, they had "to slam it shut" immediately, because the enclosed rear stairway was filled with thick, black, gas smoke; that they then hurried through the apartment toward the front of the building; that at that time the apartment was filled with smoke and there were "flames" in her bedroom and on the west wall of the living room north of the fire place; that "all four of us" went out through the vestibule onto the front porch; that the temperature was "around zero" and they were all in their night clothes; and that as soon as they got outside, "away from the smoke and fire," her husband aroused the Edmonds family.

Mrs. Robinson testified further that they had a Christmas tree in the bay window of their living room which was decorated with about 60 Noma lights; that the light bulbs were so placed on the tree that they were in close proximity to its branches and needles; that said lights were connected in several series and were so constructed and arranged that one extension cord plugged into a wall socket furnished electric current for all of them; that the tree was about 15 or 18 feet south of the partition between the living room and her bedroom; that the lights on the Christmas tree were turned on about 5 p. m. on New Year's Day and remained on until about 9 p. m. that night, when her

husband disconnected them by pulling the plug on the extension cord from the wall socket.

The testimony of George S. Robinson was to the same effect as that of his wife, except that he stated that when he was awakened by his wife and she directed his attention to the southwest corner of the bedroom, he saw that "the flames had started to break through . . . in the corner at the floor."

About 10 a. m. on January 1, 1942, the day before the fire, the plaintiff, Edmonds, went down to a storeroom in the basement to get a traveling bag, as he planned to leave the city on the following day. Edmonds testified that at that time he noticed some papers on the floor near the boiler room door and that he glanced inside the boiler room and saw to the south of the boiler a "pile" of what appeared to him to be "Christmas wrappings," the circumference of which was about 6 or 7 feet.

About 2 p. m. on New Year's Day, Edmonds drove his family to his sister's home in Wilmette and returned to his own home at 8 p. m. that evening. He and his wife and children entered the building through the garage and went up the rear stairway to their apartment. No member of the Edmonds family was in the basement after 8 p. m. on the night before the fire and no member of the Robinson family was in the basement at any time during the day or night before the fire.

The Edmonds children managed to get out of the building down the front stairway but the fire made such rapid progress that Edmonds and his wife had to be assisted by firemen down a ladder, which had been raised to one of the rear windows on the second floor. The fire completely destroyed the building and its contents.

The defendants presented evidence to the effect that in October 1941, they directed a heating contractor to inspect the heating plant and to make all necessary re-

pairs; that certain recommendations for repairs were made by the contractor and he received an order to make such repairs; that this work was completed about December 15, 1941, a little more than two weeks prior to the fire; that following the completion of the work, the heating plant was inspected by a representative of the manufacturer thereof and Myrtle G. Heil and found to be in good working order; and that before employing Lloyd Ruhlow as janitor of the building about November 1, 1940, the Heils made a careful investigation of his qualifications and he was highly recommended to them.

Lloyd Ruhlow testified in substance in defendants' behalf that he lived a few blocks from the building; that he had been a janitor for 12 years; that at the time in question he attended to four buildings; that on the morning of January 2, 1942, he arrived at the building about 5:40 a. m.; that he shook the ashes out of the fire box and pulled out the clinkers; that there was not much fire in the boiler, because he had banked it the night before; that he let the gas burn off first and then threw in four or five shovels of coal; that he adjusted the draft and waited until the gauge showed approximately two pounds of pressure; that the draft operated automatically; that when the drafts were closed, he "went about his work to the other buildings"; that when he left the basement, there was no fire except in the fire box of the furnace and its doors were closed; that there were no papers of any kind about the boiler room that morning; that before leaving he waited to see that the furnace was operating properly; that he did not drink any intoxicating liquor and was not under the influence of liquor on the morning of the fire; and that in firing the boiler that morning he followed the customary practice and procedure.

Myrtle G. Heil testified that the building was heated by "a vapor system and they are very delicate"; that when she asked Mr. Cahill, the heating contractor, in

October 1941, to check the "entire system" to ascertain what was necessary in the way of repairs, he said that he "didn't feel competent to take care of it"; and that he requested the "Dunham people [manufacturer of the heating plant] to check with him."

When John W. Cahill, who had been in the plumbing and heating business for 22 years and had made the repairs to the heating plant in October 1941, and inspected same in December 1941, was asked upon cross-examination to explain the principle upon which the vapor heating system in the building operated, he testified that it operated on "ounces" instead of "pounds" of pressure.

The janitor testified on cross-examination that the building was heated by a "hot water system"; that "hot water" and not "steam" went through the radiators; that there was a pressure gauge on the boiler with two arms or hands, one of which indicated pounds and the other ounces; that he did not know whether there was any relation between "the pounds on the gauge and the ounces on the gauge"; and that in operating the boiler he disregarded the ounces of pressure shown on the gauge and regulated its operation solely by the pounds of pressure indicated thereon.

Defendants first contend that "the evidence in this cause utterly failed to establish wilful conduct and the judgments may, therefore, not stand."

This contention is purely an afterthought and it is difficult to believe that defendants' able and experienced counsel contemplated that it would be seriously considered. Reference to paragraph 3 of the first count of the complaint, heretofore set forth, will show that the word "wilful" was inaptly used therein but it will also show that it was not used in such a manner as to constitute a charge of wilful conduct. Neither count of the complaint charged defendants with wilful conduct. From the inception of this litigation until the judgments appealed from were en-

tered, defendants treated both counts of the complaint as charging them only with negligence. This case was tried solely on the issue of negligence and it was submitted to the jury on that issue only. No instruction was tendered by either side or given to the jury on the question of wilfulness. The members of the jury did not see the complaint and were not apprised of its contents. The point urged in the instant contention was not included in the alleged errors specified in defendants' motion for a new trial. Therfore there is not the slightest merit in the instant contention.

Defendants next contend that "the trial court improperly applied the doctrine of Res Ipsa Loquitur to the case."

Defendants concede that the general charge of negligence in the second count of the complaint warranted the application of the doctrine of *res ipsa loquitur* but they insist that, "inasmuch as the evidence failed to support the general charge, the court erred in applying the rule." The rule is defined as follows in *Feldman v. Chicago Rys. Co.,* 289 Ill. 25, at p. 34:

"The doctrine of res ipsa loquitur may be stated thus: When a thing which has caused an injury is shown to be under the management of the party charged with negligence and the accident is such as in the ordinary course of things will not happen if those who have such management use proper care, the accident itself affords reasonable evidence, in the absence of an explanation by the parties charged, that it arose from want of proper care."

In *Bolger v. City of Chicago,* 198 Ill. App. 123, the court, referring to the doctrine of *res ipsa loquitur,* said at p. 125:

"It is a very ancient and salutary principle of law, that where one has charge or management of a thing in connection with which an accident happens, which in the ordinary course of things does not happen if those who have the management use proper care, it affords reasonable evidence, in the absence of explanation by

the defendant, that the accident arose from a want of proper care; that in case of such an accident the duty of explanation is thrown upon those having charge of the thing, particularly when information concerning the thing itself is within the particular or peculiar knowledge of the defendant.''

Was the trial court justified under the facts and circumstances in evidence in applying the doctrine of *res ipsa loquitur?* The fire did not originate in either the Robinson or Edmonds apartment. It was first discovered by Mrs. Robinson in the southwest corner of the front bedroom of her apartment, about 15 minutes after the janitor had fired the boiler and left the building. The corner where the fire was discovered was the juncture of the west wall of the building with the partition that separated the Robinsons' living room from their bedroom. That partition was approximately above the wooden partition that separated the boiler room from the rest of the basement. Immediately after his wife discovered the fire, Robinson saw that ''flames had started to break through . . . in the corner at the floor.'' The boiler room and the heating plant therein were directly under Robinson's living room. Within seconds after the fire was discovered the Robinson family was prevented from leaving the building by way of the kitchen door, because of thick, black, gas smoke that was pouring up from the basement through the enclosed rear stairway. The fire made such rapid progress that Edmonds and his wife had to be rescued from their second floor apartment by firemen. On the day before the fire Edmonds saw a large pile of what appeared to him to be Christmas wrappings in the boiler room south of the boiler. Defendants admitted their exclusive control, operation and management of the boiler room and the heating apparatus therein.

In our opinion the foregoing circumstances and conditions under which the fire occurred afforded sufficient prima facie evidence to raise a presumption of defend-

ants' negligence. Therefore, the trial court correctly held that the doctrine of *res ipsa loquitur* applied to plaintiffs' evidence as to the occurrence of the fire and the circumstances attending it.

The application of the doctrine presents principally the question of the sufficiency of circumstantial evidence to justify the inference of negligence and the rule is based largely on the consideration that where the control of the thing which has caused the injury or damage is exclusively in the defendant, it is within his power to produce evidence of the actual cause, which the plaintiff is unable to present. The presumption of defendants' negligence was of course rebuttable and it was incumbent upon them to furnish an explanation of the occurrence of the fire consistent with due care on their part, if they could. Whether the evidence introduced by them in explanation of the occurrence of the fire was sufficient to rebut the presumption of their negligence was a question of fact for the jury to determine. The credibility of the witnesses and the probability of their testimony were also matters for the jury to determine.

In view of defendants' evidence that the vapor system used to heat the building was "very delicate," that the experienced heating contractor employed to repair it "didn't feel competent to take care of it" by himself, that the vapor heating system in the building operated on "ounces" instead of "pounds" of pressure, that the janitor thought that the heating plant was a hot water system and not a vapor system and that he operated the plant on "pounds" instead of "ounces" of pressure, the jury was warranted in finding, as it did, in answer to a special interrogatory submitted to it at defendants' request that the janitor fired the heating plant, "immediately preceding the fire in question, in an improper and unworkmanlike manner."

Defendants argue that it might be just as reasonably inferred that the fire had its origin in the Christmas tree "overloaded with lights" as that it had its origin in the boiler room. There is not a single fact or circumstance in evidence from which it could be inferred, reasonably or otherwise, that the fire was caused by the Christmas tree lights. It is undisputed that the Christmas tree lights were disconnected from the electric current when Robinson pulled the plug on the extension cord from the wall socket at nine o'clock on the night before the fire. The Christmas tree was in the bay window of the living room and more than 15 feet from the partition, on the bedroom side of which the fire was first discovered by Mrs. Robinson. Her husband testified in effect that the fire was breaking through the floor at the southwest corner of the bedroom, when his attention was called to it. The fact that the Robinsons were prevented from leaving the building through the kitchen door, after they discovered the fire, because of the thick, black, gas, smoke, which was pouring up through the enclosed rear stairway, precludes even the possibility that the fire had its origin in the Christmas tree. It was not until after the Robinsons had made their futile effort to leave the building by way of the rear stairway and then hurried toward the front of the apartment that they saw fire on the north portion of the west wall of the living room, as they were leaving the apartment through the front doorway.

Defendants assert that "it is the law that the mere occurrence of a fire raises no presumption of negligence." In support of this proposition they cite *Welch v. New Harper Hotel Co.*, 196 Ill. App. 94, wherein it is said at p. 100: "The fact that a fire occurred would not of itself raise any presumption of negligence." Of course, it is the law that the fact that a fire occurred does not in itself raise any presumption

of negligence, because fires frequently occur without negligence. But the evidence here not only showed the occurrence of the fire but numerous other circumstances from which it could be reasonably inferred that the fire originated in the boiler room. As was said in *McClure v. Hoopeston Gas & Electric Co.*, 303 Ill. 89, at p. 105, "the origin of a fire has generally been held sufficiently established by inferences drawn from slight circumstantial evidence."

It is also argued that "it is elementary that the origin of the fire be shown by direct proof to have been in a part of the premises under the exclusive control of the defendants." The proposition sought to be advanced by this argument is not only not elementary but it is not a correct statement of law. Plaintiffs had the right to prove their case or any essential element thereof by direct or circumstantial evidence and in criminal as well as in civil cases a verdict may be founded on circumstances alone. (*Panella v. Weil-McLain Co.*, 329 Ill. App. 240; *Gardner v. Railway Express Agency, Inc.*, 274 Ill. App. 626; *Norkevich v. Atchison, T. & S. F. Ry. Co.*, 263 Ill. App. 1.)

It is not claimed that the general verdicts were against the manifest weight of the evidence and the special finding of the jury hereinbefore referred to serves to confirm the propriety of the general verdicts.

It is contended that the trial court erred in giving to the jury at plaintiffs' request instruction No. 3, which is as follows:

"You are instructed that if you believe from the preponderance of the evidence and under the instructions of this court that the plaintiffs were in the exercise of ordinary care for the preservation and care of their property at the time of and immediately before and long prior to the fire in question and that the defendants, through their agent and servant, were in the exclusive possession and control of the boiler room and heating plant or apparatus in the basement of the

building in question just prior to the time of the commencement of the fire and for a long time prior thereto, and that said fire originated and started in said boiler room; and if you further find that all other persons were absent from the said boiler room at the time of and immediately preceding said fire and for a long time prior thereto, and had nothing whatsoever to do with said boiler room or its contents including the heating apparatus; and if you further find from the evidence that the occurrence of the fire was such an event as does not ordinarily occur if due care were used by the defendants in operating and maintaining said boiler room and heating apparatus, then and in such case the law is that there arises a presumption of negligence on the part of defendants.''

We approved a similar instruction in *Oakdale Building Corp. v. Smithereen Co.*, 322 Ill. App. 222, wherein we said at p. 228: ''We think the instruction should have been given because it correctly states the rule that a presumption of negligence arises under the circumstances set forth in the instruction.''

It is further contended that plaintiffs' instruction No. 3 was inconsistent and in conflict with the following instruction given at defendants' instance:

''You are instructed that you are not at liberty to guess or conjecture that the occurrence in question may have happened because of some negligence of the defendants, but unless you believe from a preponderance of the evidence that the occurrence happened through some alleged negligence of the defendants then you should find the defendants not guilty. No presumption that the defendants were negligent arises solely because the fire occurred.''

It will be noted that the foregoing instruction concludes with this sentence: ''No presumption that the defendants were negligent arises solely because the fire occurred.'' It is argued in support of the instant

contention that the jury was told by plaintiffs instruction No. 3 that "a presumption of negligence on the part of defendants might be drawn against the defendants substantially upon a finding of the existence of the fire alone" and that "it is plainly seen that these instructions are not in harmony" and that "they are in direct conflict." It is a sufficient answer to this argument that even a casual examination of the two instructions demonstrates that they are not "inconsistent" or in direct "conflict" with each other.

It is further contended that "the court erroneously admitted evidence of intoxication on remote occasions." It will be recalled that the first count of the complaint charged that the defendants were guilty of negligence in that they "employed incompetent, negligent help to operate said heating plant and permitted in their employ a person to fire said heating plant who, immediately preceding the time and place of the fire in question was under the influence of liquor and, who immediately preceding the fire, fired the heating plant in an improper and unworkmanlike manner."

There is no evidence in the record that the janitor was under the influence of liquor either during the day or night before the fire or on the morning of its occurrence. The trial judge permitted several witnesses for plaintiffs to testify, over defendants' objection, that they saw the janitor in and about the building in an intoxicated condition at various times prior to the fire. Robinson testified that he saw the janitor intoxicated on at least three occasions during the period from October 1, 1941, until about the middle of December 1941. Mrs. Robinson testified that she saw him intoxicated late in November 1941. Edmonds testified that during the year 1941, the janitor "sometimes acted as though he was under the influence of liquor," the last time being during the "Christmas Holiday" preceding the fire. James W. Cotter testified by way of impeachment, over defendants' objection, that about

three months after the fire he saw the janitor in his own home and that at that time he "appeared to be either intoxicated or in the process of getting over it."

Six witnesses, in addition to the janitor and members of his family, testified in defendants' behalf that he was not addicted to the use of intoxicating liquors.

Without deciding but assuming that all of the foregoing testimony presented by plaintiffs as to the intoxication of the janitor was immaterial and incompetent, can it be said that the admission of this testimony was prejudicial to defendants? We think not, in view of the answer made by the jury to a special interrogatory submitted to it by the trial court at defendants' request. This interrogatory and the jury's answer thereto are as follows:

"Was Lloyd Ruhlow, immediately preceding the time and place of the fire in question, under the influence of liquor?

"Answer No."

Since the jury's answer to this interrogatory was favorable to defendants on the question as to whether or not the janitor was intoxicated immediately preceding the fire, the jury could not have been prejudiced by plaintiffs' evidence that he was intoxicated on prior occasions. If the trial court erred in admitting this evidence, it was harmless error.

Defendants finally contend that "the court erroneously admitted evidence of occurrences long prior to the fire."

Charles F. Loeffel testified in plaintiffs' behalf on rebuttal that he lived in the first floor apartment of the building in question from May 1938, until about May 1, 1940, and that during that period Mr. and Mrs. Heil were the managers of the building. He testified further, over defendants' objection, that he and his wife came home late in the evening on New Year's Eve, 1939, and noticed through a window that "the basement was all aglow" and that he "promptly went down

stairs into the basement to investigate and found the doors on the furnace almost of white heat and that the safety device had been blown off by this heat.'' The trial judge inquired as to when Ruhlow became janitor of the building and when he was advised by defendants' lawyer in the presence of the jury that it was not until October 7, 1940, which was more than nine months after the occurrence testified to by Loeffel, the presiding judge sustained defendants' motion to strike Loeffel's testimony and instructed the jury to disregard it.

The following argument is made in defendants' brief: ''The fact that the court on our motion struck the testimony of the witness, Loeffel, from the record cannot cure the error in its admission. On this proposition, it must be remembered that the evidence was heard in full by the jury. Its prejudicial effect is obvious. The impression made upon the minds of the jury could not be erased by the mere action of the court in striking it. The best statement of the rule with which we are familiar is found in *Throckmorton v. Holt,* 180 U. S. 552, 44 L. Ed. 663, where the Supreme Court said, at page 671: 'The general rule is that if evidence which may have been taken in the course of a trial be withdrawn from the consideration of the jury by the direction of the presiding judge, that such direction cures any error which may have been committed by its introduction. ⋅ . . But yet there may be instances where such a strong impression has been made upon the minds of the jury by illegal and improper testimony, that its subsequent withdrawal will not remove the effect caused by its admission, and in that case the general objection may avail on appeal or writ of error.' ''

Defendants operated, maintained and managed the boiler room and the heating plant therein through their agent and servant, the janitor, and it was his conduct primarily that was in question. We

would be inclined to agree with defendants that Loeffel's testimony might well have made a strong impression on the jury, even though it was withdrawn at the direction of the trial judge, if it were not for the fact that the reason for its withdrawal was stated in the presence of the jury—that the occurrence related by Loeffel happened before Ruhlow became janitor of the building. Regardless of how strongly the jury may have been impressed by the testimony of Loeffel, that impression must have been immediately removed when the members of the jury were advised as to the reason for the withdrawal of his testimony. In view of what we have already said as to Loeffel's testimony and the circumstances under which it was withdrawn, we do not think that it had any prejudicial effect on the jury or influenced its verdicts.

In *McKenna v. Chicago City Ry. Co.*, 296 Ill. 314, the court said at p. 326:

"While the authorities are not unanimous, the general rule is that striking out evidence erroneously admitted during a trial cures the error except in extreme cases, where it is manifest the prejudicial effect of the evidence remained with the jury despite its exclusion and influenced their verdict. (38 Cyc. 1440, and cases in note: *Pennsylvania Co. v. Roy,* 102 U. S. 541.) In *Brown v. Illinois, Iowa and Minnesota Railway Co.,* 209 Ill. 402, the court said, where improper evidence is stricken out by the court it will not be reversible error unless it appears the jury were influenced by reason of its introduction. We do not consider this an extreme instance where it is manifest that the effect of the evidence stricken out remained and influenced the jury. The size of the verdict does not indicate it, and as said by the Court in *Devine v. Chicago City Railway Co.,* 262 Ill. 484, we must assume the jury possessed the qualifications required by the statute. If they did, they knew when the evidence was stricken out it was not to be considered by them.''

For the reasons indicated herein the judgment of the superior court of Cook county in favor of the plaintiff, Robert S. Edmonds, and against the defendants is affirmed.

*Judgment affirmed.*

FRIEND, P. J., and SCANLAN, J., concur.