CLAUDETTE DYBACK, Plaintiff and Counterdefendant-Appellant, v. ARTHUR J. WEBER *et al.*, Defendants and Counterplaintiffs-Appellees.

Second District   No. 84—0974

Opinion filed July 5, 1985.—Rehearing denied August 6, 1985.

REINHARD, J., dissenting in part.

Patrick A. Salvi and Kerry A. Forman, both of Waukegan, for appellant.

Clayton P. Voegtle, of Snyder, Clarke, Dalziel & Johnson, of Waukegan, for appellees.

JUSTICE UNVERZAGT delivered the opinion of the court:

The plaintiff, Claudette Dyback, sued the defendants, Arthur J. Weber and Francis E. Weber, doing business as Weber Brothers Construction Company, in the circuit court of Lake County, for damages caused by fire to a house owned by the plaintiff. The defendants had been hired by the plaintiff to repair the unoccupied house which had previously been damaged by a fire caused by lightning.

The cause came on for jury trial on plaintiff's first amended complaint in three counts. Count I charged the defendants were guilty of negligence in not maintaining sufficient security on the premises, and in improperly maintaining kerosene heaters on the premises; count II alleged the defendants were liable to plaintiff under the theory of *res ipsa loquitur*; and count III was predicated on a breach of warranty.

At the close of the plaintiff's evidence, the defendants moved for a directed verdict on all three counts. The trial court directed a verdict of not guilty as to defendants on all three counts. Plaintiff appeals the judgment directing verdicts as to counts I and II. No appeal is taken from the judgment as to count III.

The plaintiff presents four issues on appeal: (1) whether the court erred in directing a verdict as to count II based on *res ipsa loquitur*; (2) whether the court erred in directing a verdict as to count I alleging negligence; (3) whether the court erred in excluding certain testimony proffered by plaintiff's expert witness; and (4) whether the court improperly considered matters which were not in evidence.

A review of the evidence presented shows that plaintiff, Claudette Dyback, contracted with the defendants, Arthur J. Weber and Francis

E. Weber, d/b/a/ Weber Brothers Construction Company, for reconstruction work to her home in Arlington Heights. The house had been damaged by a fire caused by lightning in the summer of 1977. A second fire, which occurred on December 28, 1978, prompted the instant suit.

After the trial court granted the defendants' motion for a directed verdict, the jury was then waived, and the cause proceeded on defendants' counterclaim against plaintiff for payment for work performed up until the time of the fire. The trial court entered judgment in defendants' favor on the counterclaim against plaintiff in the amount of $10,780.72 plus costs. The plaintiff does not appeal the judgment on the counterclaim.

Arthur J. Weber testified as an adverse party under section 2—1102 of the Civil Practice Law. (Ill. Rev. Stat. 1983, ch. 110, par. 2—1102.) Work on the plaintiff's house began in October 1978, and continued on and off two to three days a week until the second fire occurred. The house was unoccupied, and there was no heat. Plaintiff gave the defendants a key to gain entrance to the house, and they were in charge of locking up and securing the residence at the end of each work day. Defendants brought a heater called a "salamander" into the house the latter part of November or the first part of December. The heater was a used one, and had been purchased about a year earlier. It was a tube-shaped heater with a capacity for fuel oil or kerosene of about nine gallons. The heater was moved from room to room during the work, and at the conclusion of each work day was stored in the bedroom behind the living room on the first floor. Defendants also stored their tools overnight in the same bedroom because they would be out of sight there. The heater was filled with fuel oil which the defendants brought to the house.

The fire in question took place at 3 a.m., on Thursday, December 28, 1978. The witness testified that Monday was Christmas, and that he and his brother worked on the house at least one or two days that week. He could not recall for sure if they had been working on the house on Wednesday, but if so it would have been until about noon that day. There were no pilot lights on in the house while they were working there because the gas was not turned on. To his knowledge, no one had broken into the house during the period of time when they were working at the house. He felt there was probably some fuel oil left in the tank before the fire, but he could not recall whether they had used the heater during the last time they worked at the house before the fire. The heater was left on the premises, although it could have been loaded into one of the brother's trucks and unloaded the

next time it was needed.

The fire substantially destroyed the house, more so than after the first fire. The heater was still in the back bedroom after the fire. It had a 6-foot cord, and the nearest outlet was 10 to 15 feet away. The witness did not recall either using or unplugging the heater the day before the fire. Only the witness and his brother had control of the heater. The fire burned the rubber tires off the heater. The witness testified at the time he was doing this work, he smoked about a pack and a half of cigarettes a day. While working at the house, he would dispose of cigarettes by trying to flip them out of the window before they were out.

The witness also testified he did not think the key they had for the house fit both the back and the front door, but he could not recall which one it did fit. The only live outlet was in the dining room area and with an extension cord, they could plug the heater in and move it toward the living room. He never saw any evidence of vandalism in the house. He and his brother had nothing to do with getting the furnace that was damaged from the first fire fixed, and the furnace was not operating the day before the fire. The witness testified that not all of the upstairs windows had glass in them.

The plaintiff, Claudette Dyback, testified she purchased the house in 1974 and was the sole owner. Because she was not at the house and the defendants had to get in and out periodically, she gave them a key as they requested. When the contract was signed, it was discussed that the defendants "would have full responsibility of the house until the said house was reconstructed and done and the key turned back over to [plaintiff]."

She visited the house on occasion during the progress of the work. When she saw the house late on the morning of December 28, it was about 90% demolished as a result of the fire. The house was eventually condemned, and she had the house razed.

On cross-examination, plaintiff testified the defendants' work was not to include decorating; i.e., washing the walls, painting. The house had a front and back door, and sliding glass doors in the front. The key she gave the defendants only opened either the front or back door, and it was the only key for that door. She had other keys to doors for the house, but not to the two outside storm doors which locked from inside. There were interior doors inside the storm doors, and she had a key to one of those doors.

A little window in the living room downstairs was not intact after the first fire, and she had requested the defendants to replace it. She was not aware that anybody had tried to break into the house be-

tween the first and second fires, nor had she cautioned the defendants to watch out for any such activity. She may have had some things stored in the downstairs office bedroom, but most of the big items had been taken out and put in storage. She told the defendants to lock the house, and take care of it.

On redirect examination, plaintiff testified she did not know the heater was on the premises. During construction while the defendants were there working, she only used the door the defendants had opened to go into the house.

On re-cross-examination, plaintiff testified all the floor coverings on the first floor, such as carpeting, were taken out after the first fire.

James Miller testified as an expert witness for the plaintiff. He reviewed a report prepared by Ken Schultz, an employee of Russell & Associates, as to the investigation of the fire. The report contained a narrative, photographs, and a diagram. He also reviewed the two defendants' and plaintiff's depositions, a forensic chemist's report as to the chemical analysis of samples taken by Schultz, and fire reports from the fire department.

The witness attributed the fire to the fuel oil from the salamander heater. His opinion was based on the fact there was no carpeting or padding on the floor, and bare wood is almost impossible to burn unless something on top of it is burning. The Russell report, photos and narrative indicated heavy charring to the entire area of the living room and a portion of the bedroom. The charring went down at least one-half inch to three-quarters of an inch. That indicated to Miller that something must have been on that surface, burning, to cause such a degree of damage. The fire burned downward, whereas fire normally burns upward.

Miller was asked to explain the difference between his opinion and that of Schultz in the Russell report, whose impression was that the fire was caused or may have been caused by a person or persons unknown. He stated Schultz did not have the benefit of the forensic chemist's report of the analysis of the five samples taken from the house. One taken from the fuel tank of the salamander was identified as a substance similar to fuel oil with a kerosene base. One taken from the attic area showed the presence of naptha, but no accelerants were found on the bedroom floor, living room floor and hallway even though Schultz' report indicated that he detected accelerants in those three areas.

Miller was asked whether the fire would have occurred if the user of the salamander would have used ordinary care in its maintenance

and use. The defendants objected to this question, and plaintiff made an offer of proof that Miller would say that the fire would not have occurred had ordinary care been exercised. During argument, plaintiff stated the negligence claimed was that the heater was not taken out of the house each day, and that one of the possible sources of ignition was smoldering cigarettes. Plaintiff was allowed to proceed with questioning of Mr. Miller; counsel asked him what relationship he would draw from the salamander that was on the premises and the fire. Miller noted that the Russell report described the fire trail in the bedroom where the salamander was, and the heavy degree of charring in the living room, and that the photo of the salamander showed its undercarriage and wheels were heavily damaged and distorted and even melted from the high heat. The heavy damage to the living room and bedroom floor and the underside portion of the salamander, coupled with the fact of very little damage above the level of the floor and the heater, caused Miller to attribute the fire to the fuel oil from the salamander. He concluded the oil was from the salamander heater because one of the defendant's depositions indicated the tank was half full and the report from Russell & Associates indicated very little fuel left when he took a sample for the forensic chemist. Miller had no idea what caused the ignition of the fire. He testified a still-lit cigarette would not have been consistent with the type of ignition that could ignite the fuel oil.

He did not attribute the fire to arson, because the report from Russell & Associates and the fire department did not indicate any forcible entry had been made into the residence. Miller was asked what various types of ignition would be sufficient to ignite fuel oil. Miller testified:

"Fuel oil, of kerosene base, normally has to either be heated sufficiently to vaporize to then burn, or to provide a wick of some type through capillary action and then heat applied to that capillary action to kerosene so that the minute particles can vaporize. That's why with the new kerosene heaters they have out now, that's why the kerosene does not burn.

In theory you could put your cigarette out right in kerosene, unless you held it long enough to let it vaporize, you know, but I'm saying if you put it down into kerosene, it will go out. You need a wick basis for it to vaporize to then subsequently burn."

When asked again to state what types of ignitions he has seen that have been sufficient to ignite fuel oil, defendants' objection to the question as immaterial was sustained. Over objection, Miller was allowed to testify that in his opinion the fire would not have occurred

had the salamander not been there.

On cross-examination, Miller testified he did not know whether the salamander heater tank leaked. He had no idea how the oil got on the floor but he believed that somehow that oil left the tank, was ignited by some means, and caused the fire.

He formulated his opinion that fuel oil left the tank because one of the defendant's depositions indicated the tank was at least half full, and Schultz' report indicated that when he looked in the salamander there was some fuel in it. Schultz' inspection was done in February of 1979; the fire occurred December 28, 1978.

Plaintiff renewed her request that she be allowed to ask Miller whether the fire would have occurred if the user of the salamander had used ordinary care in its use and maintenance. The request was denied.

Schultz took five samples to be examined by a forensic chemist. Only one of the samples, the one taken directly from the salamander tank, indicated any fuel oil. Another sample taken from the attic showed naptha. The other three samples taken from the hallway leading to the kitchen, the stairway leading upstairs, and from the middle of the living room floor, did not show any accelerant. Miller testified an accelerant is anything that either speeds up a fire or produces a much higher heat. An accelerant is anything flammable, anything of a hydrocarbon base or some other chemical base; naptha and fuel oil both have a hydrocarbon base.

According to Schultz' report, which the witness was relying on, the fire started at the front door in the living room. There was heavy charring upstairs in the attic adjacent to where the evidence of naptha was found, with the fire burning downward, indicating at some point in time there were two separate fires. It was Schultz' opinion that the burn pattern found upstairs in the attic where a hole was burned completely through the floor indicated that a flammable liquid was poured on the floor of the attic.

Miller agreed there was nothing in Schultz' report to indicate that he believed the salamander caused the fire. There was no indication in the report that the salamander leaked. The report indicated it appeared the fire burned on the floor level below the salamander, but there was no burning on the salamander itself caused by oil.

In formulating his opinion, Miller testified he reviewed records from the Prospect Heights fire department, including a letter of March 3 addressed to Arthur Weber by Fire Chief Gould of the Prospect Heights fire department. This letter indicated it was his department's opinion the portable heater located in the room behind the liv-

ing room could not have been the cause of the fire because it was not plugged in and because that area was not the source of the fire. Chief Gould was on the scene of the fire at the time of the fire and immediately following it. Miller stated he never talked directly with Chief Gould or any of the firefighters.

The witness' review of the depositions indicated to him that the wall separating the bedroom from the living room was only a studded wall not having been plastered or drywalled. He made that conclusion because drywall was just ordered, but he admitted there was nothing in the depositions to indicate whether or not any of the drywall was intended for that particular wall, so it could have been a completed wall and his assumption of only studs might be mistaken.

Miller agreed that the scorching of the bottom side of the tank of the salamander would not in and of itself indicate there was oil that caused the fire. He agreed further that the burn pattern found by Schultz would in and of itself not lead to the conclusion that oil caused the fire. He disagreed that Schultz' report did not indicate it was Schultz' conclusion based on the burn pattern that accelerants were poured on the floor. Miller also disagreed with the conclusion reached by Schultz on the final page of his report indicating that the fire was set by a person or persons unknown at the time. He disagreed that they poured some product throughout the second floor area as well as the first floor area and ignited it just prior to exiting the building, probably through the front door.

Mr. Miller admitted the only time he visited the burned structure, in January of 1980, he went there solely to measure the premises for an evaluation of the loss, not to investigate the origin of the fire. He measured the entire perimeter of the building. He did not go inside the building. He conducted his inspection entirely from the exterior, except to the extent that he could see inside.

The investigation by Schultz was conducted more than 30 days following the fire. There was nothing in the reports or materials which were reviewed by Miller which would indicate if the heater or premises remained unchanged from the time of the fire until the time of Schultz' inspection. Miller stated it was his opinion that the fire did not start in the same room as the heater.

On redirect examination, Miller testified his investigation showed the fire was not caused by any weather conditions or wire malfunction. Miller explained that one of the reasons he felt fuel oil caused the fire was because Schultz' report indicated the presence of accelerants, yet three of the samples tested were negative for accelerants. Since fuel oil burns about 99.9% pure, it would explain the negative

results obtained when the samples were tested for hydrocarbons. Miller testified over objection that naptha is another hydrocarbon base that, through further distillation, is used primarily in spray painting, and also in the cleaning of brushes. The reports he reviewed did not show any area of forced entry.

Miller was questioned on re-cross-examination about his opinion that the ceiling joists had fallen on the living room floor and were part of the reason the chemical analysis failed to show the presence of any accelerant in that sample. Schultz' report indicated that once the fire reached the ceiling joists, they were totally consumed by the fire. Miller agreed the photographs taken a month or so after the fire only showed the joints missing, not falling.

Defendant Francis E. Weber testified under section 2—1102 of the Civil Practice Law as an adverse party. (Ill. Rev. Stat. 1983, ch. 110, par. 2—1102.) The witness testified he had no way of knowing whether plaintiff had retained a key for the house or not. He did not recall ever arriving there and finding her already in the house. He and his brother had other jobs going on at the same time as plaintiff's. Plaintiff never interfered with their work. About two weeks before the fire, they brought a salamander fuel heater onto the premises. When they left the job site at the end of the day they would leave the heater there and always put it in the rear bedroom. He testified that in using the heater, it would be necessary for it to be moved out of the bedroom and into the living room. At the end of the day, they would move it into the back bedroom because otherwise someone might see it and they were fearful of someone stealing it or lighting it. He testified that possibly he was even more fearful of it being lit. They did not remove the heater from the premises on a daily basis because they did not see any sense in hauling it back and forth every day. It would have been somewhat inconvenient to remove it from the premises each day. One person could lift it onto a pickup truck, and both he and his brother had pickup trucks. The witness did not recall if they had been at the house on Tuesday or Wednesday before the fire.

Weber testified that during the day they moved the heater to the living room. Most of the work to be done was upstairs, so the heater was placed near the stairway. They never took the heater upstairs. If the heater was full of oil it could not be moved with ease onto their truck. If it was full of oil he could lift it up, but he would not want to lift it up and carry it out. If he were to have removed it he would have to take it off the truck at his home and move it into a garage each night and reverse the procedure to bring it back because his

truck is left outside overnight. The same would be true for his brother. The heater was not used the last day they were on the premises before the fire. It was not even moved out of the room where it was stored.

## RES IPSA LOQUITUR

■■ The plaintiff contends the trial court erred in directing a verdict for the defendants at the close of her evidence, and argues she had established a *prima facie* case of *res ipsa loquitur* in negligence. Based on our review of the record, we agree with her contention.

Plaintiff and the defendants do not dispute the nature of, or the requirements for the application of, the *res ipsa loquitur* doctrine. As recently described in *Curtis v. Goldenstein* (1984), 125 Ill. App. 3d 562, 564:

> "The *res ipsa loquitur* doctrine permits the trier of fact to draw an inference of negligence based upon circumstantial evidence if the plaintiff can demonstrate three things: (1) that her injury is of the kind that ordinarily does not occur in the absence of negligence; (2) the injury was caused by an agency or instrumentality within the defendants' exclusive control; and (3) the injury was not due to any voluntary act or neglect on the part of the plaintiff. (*Spidle v. Steward* (1980), 79 Ill. 2d 1.)"

Although not dispositive here because the third element set forth above is not at issue, it is nevertheless curious to note that every recent case—save one—recites these same three elements, despite the fact Illinois adopted comparative negligence four years ago, and a plaintiff's freedom from contributory negligence no longer need be pleaded or proved in negligence. (*Alvis v. Ribar* (1981), 85 Ill. 2d 1.) Plaintiff's original complaint filed February 13, 1981, pleaded her freedom from contributory negligence in both counts I and II; counts I and II of her first amended complaint, filed June 7, 1982 (after the June 8, 1981, effective date of the *Alvis* decision), did not include such pleadings. Although discussed in the context of an instructional error, the court in *Mileur v. Briggerman* (1982), 110 Ill. App. 3d 721, 728, found there is "no sound reason why a plaintiff must prove freedom from contributory negligence in a *res ipsa loquitur* case when he is not required to do so in other negligence actions."

The point is noted here in view of the fact that the duty of the trial court in the first instance is to decide whether, as a matter of law, the *res ipsa loquitur* doctrine applies at all. *Curtis v. Goldenstein* (1984), 125 Ill. App. 3d 562, 564; *Guebard v. Jabaay* (1983), 117 Ill. App. 3d 1, 11; *Spidle v. Steward* (1980), 79 Ill. 2d 1, 7.

As stated in the *Spidle* case:

> "[T]he trial court must also determine, as a matter of law, (1) whether plaintiff's pleaded facts would ever establish the three elements of control, lack of contributory negligence [this element now obviated per *Alvis*] and the improbability of injury without negligence, and (2) whether those elements, as pleaded, gave sufficient notice to the defendant of the *res ipsa loquitur* cause of action." 79 Ill. 2d 1, 7.

Plaintiff's first amended complaint as a matter of law gave defendants sufficient notice of the *res ipsa loquitur* cause of action. Plaintiff's complaint pleaded a duty owed to her by the defendants, their exclusive control over her home, the fact of the fire and the allegation that the occurrence would not have taken place in the ordinary course of things if the defendants had not failed to use proper care in the direction, control, management and maintenance of her realty.

■ On a motion for directed verdict, the role of the trial judge is to view all of the evidence in the light most favorable to the nonmovant (plaintiff here) and decide whether a verdict for the nonmovant could ever stand. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510.) The defendants' motion for a directed verdict here was made at the close of the plaintiff's case. It has been stated that:

> " ' "A motion to instruct the jury to find for the defendant is in the nature of a demurrer to the evidence, and the rule is that the evidence so demurred to, in its aspect most favorable to the plaintiff, together with all reasonable inferences arising therefrom, must be taken most strongly in favor of the plaintiff. The evidence is not weighed, and all contradictory evidence or explanatory circumstances must be rejected. The question presented on such motion is whether there is any evidence fairly tending to prove the plaintiff's declaration. In reviewing the action of the court of which complaint is made we do not weigh the evidence,—we can look only at that which is favorable to appellant. [Citations.]" [Citation.]' [Citations.]" *Arado v. Epstein* (1944), 323 Ill. App. 194, 197.

■ The quantum of proof which a plaintiff must give in order to draw from the defendant explanatory evidence (*i.e.*, in order to shift the burden of proof to the defendant), must be dependent upon the circumstances of each case. (*Oakdale Building Corp. v. Smithereen Co.* (1944), 322 Ill. App. 222, 227.) When the plaintiff's proof shows the defendants' charge or management of a thing in connection with which an accident happens, which in the ordinary course of things does not happen if those who have the management use proper care,

the duty of explanation is thrown upon those having charge of the thing, particularly when information concerning the thing itself is within the particular or peculiar knowledge of the defendant. (*Edmonds v. Heil* (1948), 333 Ill. App. 497, 508-09.) "The application of the doctrine [of *res ipsa loquitur*] presents principally the question of the sufficiency of circumstantial evidence to justify the inference of negligence and the rule is based largely on the consideration that where the control of the thing which has caused the injury or damage is exclusively in the defendant, it is within his power to produce evidence of the actual cause, which the plaintiff is unable to present." *Edmonds v. Heil* (1948), 333 Ill. App. 497, 510; see also *Politakis v. Inland Steel Co.* (1983), 118 Ill. App. 3d 249, 252.

Plaintiff acknowledges that although the mere occurrence of a fire is not sufficient to invoke the doctrine of *res ipsa loquitur*, circumstances beyond the fact of the fire may be shown to have existed which justify application of the doctrine. (*Hahn v. Eastern Illinois Office Equipment Co.* (1976), 42 Ill. App. 3d 29, 31.) Specifically, plaintiff points to these surrounding circumstances which in her opinion gave rise to an inference of negligence: (1) that there was no gas service at the house at the time; (2) that there was only limited electrical service to the premises, and that faulty wiring was not considered a cause of the fire; (3) that on the last day on which the defendants were in the house before the fire they left kerosene fuel and the salamander heater on the premises; (4) that plaintiff's expert was of the opinion that kerosene was the accelerant that provided the fuel for the fire; and (5) there was no evidence of forced entry to the premises.

▨ Defendants contend plaintiff's evidence failed to establish that the accident was of the kind that ordinarily does not occur in the absence of someone's negligence, or that the instrumentality causing the injury was within the exclusive control of the defendants. They argue the evidence strongly pointed to arson. In so arguing, however, defendants attack the credibility of the plaintiff's expert witness and refer to explanatory and contradictory evidence given during cross-examination and clarification testimony. The credibility of the witnesses and the weight of the evidence are matters to be decided by the trier of fact (*Sandburg-Schiller v. Rosello* (1983), 119 Ill. App. 3d 318, 336), and on a defendant's motion for directed verdict at the close of the plaintiff's case, all contradictory evidence or explanatory circumstances must be rejected. *Arado v. Epstein* (1944), 323 Ill. App. 194, 197.

▨ The testimony of plaintiff's expert witness indicated the un-

contained presence of two types of accelerants; naptha upstairs on the floor in the attic and fuel oil on the floor downstairs in the living room. There was evidence lit cigarettes were disposed of by "trying to flip them out of the window." Plaintiff's expert testified there was no evidence that either a weather condition or a wire malfunction was the cause of the fire. (*Cf. Collgood, Inc. v. Sands Drug Co.* (1972), 5 Ill. App. 3d 910, 917, where a fire occurred in an area under the exclusive management and control of defendant and plaintiff offered evidence to rule out faulty wiring or fixtures as the most likely alternative cause, the court determined those circumstances and the fact of the occurrence itself were sufficient to raise the presumption of defendant's negligence in *res ipsa loquitur*.) The house was unoccupied, and defendants were the only ones allowed access to the house during construction. The fact plaintiff had keys to the house does not negate the element of control established in the defendants. The presence of some control or possession in another does not necessarily destroy the application of the *res ipsa loquitur* doctrine; the nature of the surrounding circumstances and of the intervening control or possession in another determine whether or not the doctrine may be applied. (*Erckman v. Northern Illinois Gas Co.* (1965), 61 Ill. App. 2d 137, 148.) "The usual requirement that the accident-causing instrumentality must be under the exclusive control of the defendant doesn't mean actual physical control at the time of the accident, if the instrumentality or dangerous agency is one which it is defendant's responsibility to maintain at all times and which responsibility cannot be delegated by consent, agreement or usage." *Metz v. Central Illinois Electric & Gas Co.* (1965), 32 Ill. 2d 446, 450.

We note here the defendants' view that their exclusive control has not been established because "what instrumentality started the fire is unknown" is far too narrow a view of the control that need be shown. As Dean Prosser states:

"The injury must either be traced to a specific instrumentality or cause for which the defendant was responsible, *or it must be shown that he was responsible for all reasonably probable causes to which the accident could be attributed.*" (Emphasis added.) Prosser, Torts sec. 39, at 218 (4th ed. 1971).

The reason for the exclusive control requirement is that it must appear that the negligence of which the doctrine warrants an inference is probably that of defendant and not of another; " '[t]he requirement as it is generally applied is more accurately stated as one that the evidence must afford a rational basis for concluding that the cause of the accident was probably "such that the defendant would be re-

sponsible for any negligence connected with it." ' [Citations.]" *Loizzo v. St. Francis Hospital* (1984), 121 Ill. App. 3d 172, 176.

■ The plaintiff testified she did not use a key to get into the house, because she only went there when the defendants were working and there was already an open door. One of the defendants testified they never encountered plaintiff already on the premises when they arrived to work on the house. There were no signs of an unauthorized entry into the house, which fact would have tended to decrease the exclusivity of the defendants' control of the premises. Defendants' rhetorical inquiry in their brief concerning the "unexplained" presence of naptha and how it came to be on the premises, and the fact the exact cause of the ignition of the fire is unknown, highlight the need to apply the doctrine in this case, since by virtue of their control of the premises, the defendants were in a better position to have reason to know the answers than the plaintiff. Given the circumstances of the uncontained accelerants, the admitted means of cigarette disposal, the lack of a natural, weather-related cause or a wire malfunction, and the control of the premises established in the defendants, an inference of fault in the defendants is justified and they should be held to the duty to come forward and make explanation. "This is no more than the doctrine of *res ipsa loquitur* requires." *Metz v. Central Illinois Electric & Gas Co.* (1965), 32 Ill. 2d 446, 451.

Accordingly, the judgment of the circuit court of Lake County as to count II is reversed and the cause is remanded.

NEGLIGENCE

Count I of plaintiff's first amended complaint alleged defendants specifically breached the duty of care owed to the plaintiff by virtue of one or more of the following negligent acts or omissions which proximately caused her damages:

"a) Acted in such a manner as to be the proximate cause of Plaintiff's damages;

b) Failed to properly secure, maintain and supervise the premises;

c) Improperly maintained heaters on the premises;

d) Allowed lit cigarettes to be dropped on the premises;

e) Was otherwise negligent in connection with the Plaintiff's property."

Plaintiff argues the court erred in directing a verdict for the defendants on count I based on its finding that:

"It appears to the Court that the evidence is clear that the expert is basing his opinion merely on guess and conjecture."

Plaintiff acknowledges the law in Illinois is that an expert is not permitted to guess or state an opinion based on mere conjecture. (*Schwartz v. Peoples Gas Light & Coke Co.* (1962), 35 Ill. App. 2d 25, 31-32.) Plaintiff contends, however, that the expert's opinion here that the kerosene from the salamander heater was the accelerant which gave rise to the fire was based on specific facts, not conjecture. Specifically, the burn pattern in the living room and bedroom, the charring on only the underside of the heater, and the fact a bare wood floor would not ignite and burn as it did in the absence of something burning on top of it, all combined to cause the expert to conclude that an accelerant was present. Further, because earlier investigators detected accelerants but chemical analysis failed to show any hydrocarbon residue, the expert concluded the accelerant was kerosene or No. 1 fuel oil since they burn about 99.9% pure. Finally, the expert concluded that the accelerant came from the salamander heater, because one of the defendant's depositions indicated that the last time they were on the premises, the heater was more than half full, and Schultz' report indicated there was very little fuel oil left.

Contrary to plaintiff's assertion, defense counsel did ask the expert to account for the difference between his opinion as to the cause of the fire and the other investigators' opinions; he attributed the difference to the fact the other investigators did not have the benefit of the results of the chemical analysis of the three samples taken from the first floor which failed to show any residue of hydrocarbons, thus—in his opinion—indicating the accelerant was clean-burning kerosene or fuel oil that caused the burning of the bare wood floor in the manner it did.

We agree with the plaintiff that the expert's opinion as to the source of the fuel oil was not a "guess." It has been held that an expert may give an opinion based on facts otherwise not in evidence if of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject. (See *Wilson v. Clark* (1981), 84 Ill. 2d 186, 193-96.) The expert's opinion here clearly was based on Schultz' investigative report and the deposition of one of the defendants. Whether these documents are of a type reasonably relied upon by experts in the particular field has not been questioned here.

■■ Despite our agreement with plaintiff on this point, we nevertheless conclude the court did not err in directing a verdict for the defendants on this count. It is the court's judgment and not its reasoning which matters. In pronouncing judgment, the court also stated:

"The fire did not start, according to your own expert, in the room where the salamander was located. He said it's caused by

fuel oil from the salamander on the floor of the living room and bedroom. There is no evidence whatsoever that this salamander was ever in disrepair or leaked or handled in an improper manner where they spilled oil on the floor or did anything like that. There is absolutely nothing in this record at all to indicate that either one of these defendants did anything improper.

The Court finds as a matter of law that merely leaving the unit there over night without more and the precautions that they took could not be negligence."

A reviewing court, when deciding the question of the propriety of directing a verdict for the defendant at the close of plaintiff's evidence, is precluded from weighing the evidence or reconciling conflicts, and is required to consider the evidence in its aspect most favorable to plaintiff. (*McKendree v. Christy* (1961), 29 Ill. App. 2d 195.) Viewing the evidence in its aspect most favorable to the plaintiff, the evidence fails to prove the specifically alleged conduct of the defendants proximately caused the plaintiff's injury. Even accepting *arguendo* the plaintiff's expert's opinion that the fuel oil caused the fire, there is no evidence any act or omission of the defendants caused the oil to leave the tank, or that the tank leaked or was in disrepair. Further, the evidence failed to show that any act or omission of the defendants alleged by the plaintiff caused the ignition of the fuel oil. Plaintiff's expert himself testified a cigarette could be doused by dipping it into kerosene without igniting the kerosene. He further testified the length of time between the defendants' last departure from the premises and the time the fire was reported would negate a smoldering cigarette by itself as a cause of ignition. He testified fuel oil or kerosene base could be ignited if heated sufficiently to vaporize first, or if a wick-type object effected a sort of capillary action and heat was then applied so that the minute particles would then vaporize. It is undisputed the heater was not plugged in, and there was no evidence of any other source of heat in the house.

As defendants argue, plaintiff's evidence failed to show any act or omission on their part to keep the premises secure. With regard to unsecured windows, plaintiff testified the only window not intact after the first fire was "the little one in the dining room," and that she had asked the defendants to replace it. She did not testify whether or not the window had been replaced by the defendants, and there is no evidence as to the size of the window or whether it could have been considered a security risk. According to the record, the only other windows that may not have had glass were the upstairs windows but, as defendants note, there was no evidence the windows might not have

been otherwise secured by being boarded up, and so forth.

Consequently, we conclude the plaintiff's evidence failed to prove any specific act or omission of the defendants alleged to be negligent which proximately caused the injury.

■ We note here the opposite conclusions reached as to the propriety of the court's judgment on counts I and II are not mutually exclusive. It has been held that when the plaintiff alleges *res ipsa loquitur* and attempts to prove it at trial, an alternative pleading and attempted proof of specific negligence will not preclude his recovery in general negligence, so long as the evidence of specific negligence does not show the instrumentality unequivocally, such that no other possible inference of negligence can be drawn. (*Collgood, Inc. v. Sands Drug Co.* (1972), 5 Ill. App. 3d 910, 911.) The inference of negligence raised by the doctrine of *res ipsa loquitur* does not "disappear" when specific evidence of negligence is admitted. (*Kolakowski v. Voris* (1980), 83 Ill. 2d 388, 397.) As stated in *Erckman v. Northern Illinois Gas Co.* (1965), 61 Ill. App. 2d 137, 149-50:

> "To hold that proof of specific negligence precludes the application of the res ipsa doctrine could lead to the absurd result of weak proof of specific negligence voiding a strong inference of general negligence. Such a rule would compel a plaintiff to elect, before the disclosures of proof, which theory he would adopt; it is without justification. If there is an inference of general negligence and proof of specific negligence, but reasonable men may differ as to the effect of this evidence, it should then be for a jury to determine under which theory, if any, the plaintiff should prevail."

Plaintiff's evidence here failed to show unequivocally the instrumentality which proximately caused the fire. Plaintiff's evidence still allows the inference of defendants' general negligence as we have discussed regarding the *res ipsa loquitur* count.

MATTERS NOT IN EVIDENCE

Plaintiff contends the court improperly judged the credibility of her expert witness and considered and weighed matters not in evidence when it directed a verdict for defendants on the *res ipsa loquitur* count. Plaintiff specifically points to the court's comments in ruling:

> "Naptha was on the property, the fire burned from the top down, the fire did not start in the room where the unit was located, and therefore, the Motion for Directed Verdict is well taken and granted."

Plaintiff argues those matters were not properly in evidence as a part of her case, and should not have been considered by the court in ruling on the defendants' motion for directed verdict.

Since we have reversed the judgment as to the *res ipsa loquitur* count, we need not resolve this issue.

EXCLUSION OF EXPERT'S TESTIMONY

### USE AND MAINTENANCE OF HEATER

■ Plaintiff complains the court improperly excluded testimony of her expert witness as to "whether the fire of December 28, 1978, would have occurred if the user of the salamander had used ordinary care in its use and maintenance." She proffered that the witness would have answered that the fire would not have occurred if the user had exercised ordinary care in its maintenance and use. The court noted that although experts can give opinions on ultimate issues, it did not believe the expert was qualified to give his opinion on that question, since it was plaintiff's position that defendants were negligent simply because they left the heater on the premises rather than removing it each time they finished working at the house.

Plaintiff argues the testimony should have been allowed because she pleaded *res ipsa loquitur* which does not require proof of any specific acts of negligence. Plaintiff relies on *Hahn v. Eastern Illinois Office Equipment Co.* (1976), 42 Ill. App. 3d 29, in support of her argument.

*Hahn* is distinguished by the defendants on the basis the fire there was determined to have started in the furnace itself, whereas the heater here itself was not shown to have been the origin of the fire. The court in *Hahn* determined that *res ipsa loquitur* was inapplicable to that case because the proof adduced left no room in which an inference of negligence could be raised, and plaintiff had not introduced any evidence which showed defendant to have been negligent. (42 Ill. App. 3d 29, 32, 34.) Further, although the court there stated it could see no reason why the ultimate issue of ordinary care differed from any other ultimate issue on which expert testimony is available, it found the error was not reversible since it did not affect the outcome of the case. There was no question presented in that case, however, as to whether the expert was qualified to give such testimony had it not been erroneously disallowed.

In the case at bar, plaintiff herself indicates the court found her witness to be an expert "in the area of determining the cause and origin of fires." Thus, it is clear plaintiff's expert was not qualified as an

expert to give an opinion concerning the use and maintenance of salamander heaters by residential reconstruction workmen. Further, the question posed was not the type of "ultimate question" which might have been posed in a *res ipsa loquitur* cause of action, since its focus was defendants' specific acts of negligence vis-a-vis the heater.

We conclude the court did not err in excluding this testimony.

### POSSIBLE SOURCES OF IGNITION

■■ The last issue raised by plaintiff in this appeal is that the court erred in excluding her expert's testimony in response to her question:

> "But based on your experience in the field, what types of ignitions or types of situations have you seen that have been sufficient to ignite fuel oil?"

Defendants objected to the question on the ground of materiality, and the court sustained the objection after argument.

Defendants' initial argument here is that the issue has not been preserved by plaintiff or review since it was not included in her post-trial motion. We find the defendants' argument untenable, since a post-trial motion is not needed to perfect an appeal where a trial court directs a verdict at the end of plaintiff's case. *Keen v. Davis* (1967), 38 Ill. 2d 280; *American National Bank & Trust Co. v. J & G Restaurant, Inc.* (1981), 94 Ill. App. 3d 318.

■■ As phrased, plaintiff's question clearly would have elicited an immaterial response since its basis would not have been limited to adduced facts in the case at bar, and would not have been an aid to the jury in its role as trier of fact. Further, the extent of the potential usefulness to the jury of the excluded testimony cannot even be assessed on this record, because plaintiff failed to make an offer of proof as to what her expert's testimony would have been. Thus, we conclude plaintiff failed to preserve the issue for review. *Moore v. Farmers Insurance Exchange* (1982), 111 Ill. App. 3d 401, 412.

For the reasons stated, the judgment of the circuit court of Lake County is reversed as to count II and that matter is remanded to trial; the judgment as to count I is affirmed.

Affirmed in part, reversed in part, and remanded.

HOPF, J., concurs.

JUSTICE REINHARD, dissenting in part:
While I agree with the majority decision to affirm the trial court's

directed verdict of count I, I disagree with its reversal of count II and its application of the doctrine of *res ipsa loquitur*. The plaintiff has failed to establish the second element required to infer negligence based upon circumstantial evidence. She did not put forth any evidence to establish that defendants controlled or managed the instrumentality which caused the fire. (See *Lynch v. Precision Machine Shop, Ltd.* (1982), 93 Ill. 2d 266, 443 N.E.2d 569.) In fact, there is no proof as to the cause of the fire. Recently, this court held that the doctrine of *res ipsa loquitur* is inapplicable where the origin and cause of the fire are unknown and the fire could have occurred without negligence on the part of anyone. *Allstate Insurance Co. v. Winnebago County Fire Association, Inc.* (1985), 131 Ill. App. 3d 225, 233-34, 475 N.E.2d 230.

To avoid this rule, the majority appears to expand the meaning of control. It reasons that control of the area where the fire occurred fulfills the second element of *res ipsa loquitur* where the cause of the fire is unknown. One view is that control of the area is not probative evidence of control of the offending instrumentality. *Smith v. Little* (Tex. App. 1981), 626 S.W.2d 906, 908.

Decisive here, however, is that the plaintiff's evidence did not even establish that defendants had control of the premises during nonworking hours, when the fire occurred. While the plaintiff testified that she gave defendants a key and "discussed" with them that they would have responsibility for the premises until the house was reconstructed, this is not sufficient to put control of the premises in defendants during nonworking hours. In my opinion, defendants were not under a duty here to plaintiff to anticipate or guard against injury occurring on the premises during a period of time when they did not have control over the premises. The majority here applies the doctrine of *res ipsa loquitur* past the point for which it was designed.