COLLGOOD, INC. *et al.*, Plaintiffs-Appellees, *v.* SANDS DRUG COMPANY, Defendant-Appellant.

(No. 71-34;

Fifth District—June 8, 1972.

Pope and Driemeyer, of East St. Louis, (Thomas W. Alvey, Jr., of counsel,) for appellant.

Freeark, Gunn & Harvey, of Belleville, (John B. Gunn, of counsel,) for appellees.

Mr. PRESIDING JUSTICE GEORGE J. MORAN delivered the opinion of the court:

Plaintiffs brought this action to recover for smoke and water damage to

their personal property sustained as a result of a fire which occurred in a warehouse occupied by plaintiffs and defendant Sands. The complaint alleged specific negligence and, in the alternative, *res ipsa loquitur*. At trial evidence was offered by plaintiffs in support of both theories, and to show the amount of damages. At the close of plaintiffs' case, the trial court, on motion, directed a verdict for defendant Sav-Co. At the close of all the evidence, the trial court denied plaintiffs' motion for a directed verdict on the specific negligence count, granted plaintiffs' motion for a directed verdict on the *res ipsa loquitur* count, and granted plaintiffs' motion for a directed verdict as to the amount of damages sustained. Defendant appeals. We affirm.

The testimony revealed that plaintiffs and defendant Sands were licensees and defendant Sav-Co was licensor of certain commercial premises used as a shopping center. The licensees jointly occupied a large warehouse which was subdivided by chickenwire partitions. Each subdivision was adjacent to and connected with the selling area of a licensee. Sav-Co provided regular night janitor and security service to all licensees except for defendant Sands. The night crew would never enter Sands' storage area unless requested. The foreman of the night crew testified that neither he nor his crew entered the Sands storage area on the night before the fire.

At approximately 8:00 on the morning of the fire, several Sands employees arrived at work early, as planned, in order to install some fixtures. They entered the premises during a pre-arranged break in the burglar alarm system. Except for the night crew, they were the only persons present at the shopping center between 8:00 and 9:00 A.M. At approximately 9:00 A.M., the fire department arrived on the scene in response to an alarm. The fire chief testified that when he entered the warehouse, he noticed a fire located in the Sands storage area. He pried open the locked door leading into that area, where he observed an electric space heater with red hot filaments. The heater was situated less than a foot from a burning cardboard box. Other nearby merchandise was also on fire. Dense smoke filled the entire warehouse, and water poured down from the overhead sprinkler system. The fire chief's testimony further indicated that the fire had burned a "V" pattern up the wall, and that the space heater was located near the focal point of the "V". On the basis of his investigation conducted subsequent to the morning in question, he ruled out electrical wiring or fixtures as a cause of the fire. In his expert opinion, the fire was caused by the space heater. The same conclusion was reached by plaintiffs' second expert witness, a qualified fire inspector, who testified from the facts presented in hypothetical form.

The balance of plaintiffs' evidence went to prove up damages. Plaintiffs

attempted to establish fair market value of the damaged property before the fire on the basis of business records and inventory receipts, and after the fire with the testimony of George Pulley, an insurance adjuster with several years experience in estimating fire losses. Pulley's testimony was based upon his own personal inspection, conducted immediately after the fire, of the damage sustained by each plaintiff. Pulley's estimates had also been used in preparation of certain subrogation receipts which were introduced into evidence, over objection of defendant, for the limited purpose of proving plaintiff's right to proceed against defendant.

In defendant's case, John Kennedy, a fire and explosion investigator who had previously been employed by two manufacturers of space heaters, testified that he had conducted an experiment for the purposes of this litigation wherein a similar space heater was placed varying distances from a similar cardboard box for a total of six hours without causing a fire.

On appeal, defendant-appellant Sands charges that the trial court erred in directing a verdict for plaintiffs on the *res ipsa loquitur* count, and for damages, inasmuch as subrogation receipts are improper evidence of damages.

■■■ *Res ipsa loquitur* literally means "the thing speaks for itself". It allows a rebuttable presumption of negligence to arise upon a proper showing that a particular thing happened. "The occurrence is, of itself, evidence of negligence." (*Byrne v. Boadle* (Exchequer 1863), 159 Eng. Rep. 299.) To create a presumption of negligence plaintiff must show that the occurrence actually took place; that the instrumentality of the occurrence was in the exclusive management and control of defendant or his agents; that the occurrence was not of the type which ordinarily happens in the absence of negligence; and that plaintiff was not contributorily negligent. (Prosser, Law of Torts, 4th ed.; *Metz v. Central Illinois Electric & Gas Co.*, 32 Ill.2d 446.) The purpose of the doctrine of *res ipsa loquitur* is to "allow proof of negligence by circumstantial evidence when the direct evidence is primarily within the knowledge and control of the defendant. Like any other proof, it may be explained or rebutted by the opposing party." *Metz v. Central Illinois Electric & Gas Co., supra.*

■■■ Plaintiff fulfilled the requirements necessary to create a presumption of negligence in *res ipso loquitur*. First, there is no dispute that a fire occurred. Second, plaintiff offered substantial and uncontradicted evidence that the agents of defendant Sands were in exclusive management and control of the premises where the fire started. The only others present in the building on that morning, the agents of defendant, Sav-Co, had not once entered defendant Sands' storage area during the preceding night. Third, a fire such as this is not of a type which ordinarily happens in the

absence of negligence. Illinois courts have frequently allowed *res ipsa loquitur* to operate in cases involving fires. (*Edmonds v. Heil,* 333 Ill.App. 497; *Oakdale Bldg. Corp. v. Smithereen Co.,* 322 Ill.App. 222; *Arado v. Epstein,* 323 Ill.App. 194.) In the instant case, plaintiffs were able to show that a fire occurred in an area under the exclusive management and control of defendant Sands. Moreover, plaintiffs offered evidence to rule out what would seem to be the most likely alternative cause: faulty wiring or fixtures. These circumstances, taken together with the occurrence itself, are sufficient to raise the presumption of defendant's negligence.

Defendant also contends that Illinois law does not permit a plaintiff to recover in *res ipsa loquitur* when his pleadings allege and his evidence attempts to show specific negligence. Defendant argues that by attempting to prove that the electric space heater was the instrumentality which proximately caused the fire, plaintiffs chose to rely upon proof of specific acts of negligence relating to a specific instrumentality and are thereby precluded from urging that defendant's general negligence and some unidentified instrumentality caused plaintiffs' loss.

■■ Defendant argues persuasively, and with seeming case support in Illinois, that the above theory accurately states Illinois law. We do not agree. The cases cited by defendant in support of its argument can be separated into two distinct types, neither of which apply to the present case: First, are those in which the plaintiff, whose original complaint alleged specific negligence only, seeks to introduce the theory of *res ipsa loquitur* for the first time on appeal. (*O'Rourke v. Field & Co.,* 307 Ill. 197; *Kerby v. Chicago Motor Coach Co.,* 28 Ill.App.2d 259.) Illinois courts have consistently refused to allow plaintiff to introduce a new theory of his case on appeal when such change would unfairly surprise an adversary or deprive him of the right to present mitigating or contradictory evidence on that theory. The second line of cases cited by appellant are those in which both specific negligence and *res ipsa loquitur* were alleged in the pleadings, but the evidence at trial unequivocally proved the instrumentality of the alleged negligence. (*Turner v. Wallace,* 71 Ill.App.2d 160.) In *Turner,* the only question was whether certain known conduct of defendant amounted to negligence. The Appellate Court held that an instruction of *res ipsa loquitur* should be refused "where, at the conclusion of the evidence in a case, the specific and actual force which initiated the motion, or set the instrumentality in operation is *known* (and) there is no reason for inference that some other unknown negligent act or force is responsible * * *."

In the instant case, plaintiffs' complaint contains alternative allegations of specific negligence and *res ipsa loquitur.* Therefore, the *Kerby* line of

cases cited by appellant cannot apply. Moreover, since the plaintiff made out only a *prima facie* case on the specific negligence count (defendant offered some credible evidence to show that the space heater was not the specific instrumentality which caused the fire), the *Turner* line of cases cannot apply. We believe that unless the plaintiff had unequivocally proved the instrumentality, he ought not be deprived of the right to plead and present evidence of *res ipsa loquitur*. As stated by the court of the Second Appellate District:

"To hold that proof of specific negligence precludes the application of the *res ipsa* doctrine could lead to the absurd result of weak proof of specific negligence voiding a strong inference of general negligence. Such a rule would compel plaintiff to elect, before the disclosures of proof, which theory he would adopt; it is without justification. If there is an inference of general negligence and proof of specific negligence, but reasonable men may differ as to the effect of this evidence, it should be then for a jury to determine under which theory, if any, the plaintiff should prevail." *Erckman v. Northern Illinois Gas Co.*, 61 Ill.App.2d 137.

When the plaintiff alleges *res ipsa loquitur* and attempts to prove it at trial, an alternative pleading and attempted proof of specific negligence will not preclude his recovery in general negligence, so long as the evidence of specific negligence does not show the instrumentality unequivocally, such that no other possible inference can be drawn. It is clear that plaintiff in the instant case was not precluded from recovering in *res ipsa loquitur* by his allegation of specific negligence.

The final question to be answered in determining appellant's first issue is whether a trial court may properly direct a verdict for plaintiff in *res ipsa loquitur*. Regarding directed verdicts in general, it is clear that the presence of some slight adverse evidence does not impair the direction of a verdict. (*Pedrick v. Peoria and Eastern R.R. Co.*, 37 Ill.2d 494.) The specific question, on the other hand, has been considered by a number of authorities with varying results. However, the most cogent and clear exposition of the problem is contained in *Erckman v. Northern Illinois Gas Co.*, 61 Ill.App.2d 137. There the court considered all aspects of the problem and stated at 146-147:

"The inference may be strong, requiring substantial evidence to overcome it, or it may be weak, requiring little or no evidence to refute it. [Case cited.] This is normally a question of fact to be determined by the jury. [Cases cited.] If the defendant introduces no evidence, the jury may still, in a proper case, find for the defendant.

There may also be cases where the inference of negligence may warrant a directed verdict for the plaintiff. Prosser in his work on

Torts (2d ed 1955), at page 212 states: "There are cases, however, such as that of the human toe in the plug of chewing tobacco, or the collision of railway trains trying to run on the same track, where the inference of negligence is so clear that no reasonable man could fail to accept it; and in such cases, if the defendant offers no explanation, a verdict should be directed for the plaintiff. In other words, the procedural effect of a res ipsa case is the matter of the strength of the inference to be drawn, which will vary with the circumstances of the case.' Also see Moore v. Atchison, T. & S. Fe Ry. Co., 28 Ill.App.2d 340, 350-352, 171 N.E.2d 393 (1st Dist. 1960); Oakdale Bldg. Corp. v. Smithereen Co., 322 Ill.App. 222, 226, 54 N.E.2d 231 (1st Dist. 1944); 'The Procedural Effect of Res Ipsa Loquitur.' William L. Prosser, Minnesota Law Review, Volume XX, No. 3, February, 1936."

We adopt the rationale of *Erckman* and hold that a plaintiff is entitled to a directed verdict in *res ipsa loquitur* if the circumstances are such as to make the inference of negligence so strong that reasonable men cannot reject it. In the record before us, there is no substantial evidence presented by defendant to suggest any theory of causation not involving its own negligence. Furthermore, plaintiff undertook on his own to discredit other possible theories of causation. From a reading of the whole record in a light most favorable to defendant, we believe that reasonable men could not differ in the conclusion that plaintiffs' damages were caused by the negligence of defendants, and thus the trial court's directed verdict for plaintiffs in the *res ipsa loquitur* count is affirmed.

The defendant also contends the trial court erred in directing the jury to return a verdict assessing plaintiffs' damages in the sum of $54,367.90. This aspect of the case presents two issues: First, whether plaintiffs' method for assessing damages is proper, and second, whether the trial court may, by directed verdict, fix the amount of damages. As to the proper measure of damages, the Illinois Pattern Jury Instructions, Sec. 30.14, sets out the appropriate measure for use in cases involving damage to personal property where the property, though damaged or destroyed beyond repair, is still in existence and has salvage value. That section states that the compensable element of damages is "the difference between the fair market value immediately before the occurrence and its fair market value after the occurrence." This is consistent with the general rule in other jurisdictions. In his hornbook on damages, McCormick states in Section 124 that "when personal property is wrongfully injured (a) the normal standard of recovery is the difference between the value just before, and just after, the injury." Bonbright describes the approved methods of obtaining fair market value before and fair market value after

the injury to personal property in Volume I, Chapter XV of his two volume treatise, *The Valuation of Property*. Regarding the fair market value of the property before the injury, he states that in ascertaining the value of the property in its uninjured condition, courts follow the usual rules applied to cases of complete destruction.[1] With respect to goods constituting inventory in the hands of dealers, he states that the jurisdictions are almost unanimous to the effect that replacement cost rather than selling cost is the appropriate figure to use. Thus, market value before injury refers to the market in which the dealer purchases the goods rather than the market in which he sells the goods.[2] Consequently, if goods are destroyed in the hands of a retailer, the measure of recovery is the current selling price as quoted by the wholesalers. In justification of this position, the courts have repeatedly stressed the point that the recovery should be limited to indemnity only and should, therefore, not include the unrealized profit that would be included in the selling price of the goods. Bonbright goes on to say that in certain circumstances when the dealer has incurred a substantial loss, such as missing his market on account of the injury and delay of recovery, courts may award additional damages if properly proved.[3] Regarding the methods of proving value, McCormick states in Section 46 that the market value of personal property may be proved by opinion evidence of those who are familiar with the prices of such property at the particular time and place, or by price lists and market reports proved to such as are generally relied in the trade. "The commonest sort of evidence of value is the opinions of witnesses as to market value. Before such opinion may be received, the witness must be shown, usually by questioning the witness himself, to be qualified; that is, to be familiar with the market value of such property at the time and place in question. * * * Professional expertness as a dealer is not required."

Plaintiff Collgood established the fair market value of the damaged goods before the fire through testimony of the witness Winegarden, a certified public accountant and officer of Collgood's parent company. Winegarden stated that the estimates of the value before the fire were made a short time after the fire. They were figured at the cost to Collgood, rather than at the retail selling price. They were calculated by taking the percentage mark-up for each item and applying it to the retail selling price, as shown on the inventory slips. The inventory slips represented property actually on hand at the time of the fire, and were

---

[1] Bonbright, p. 363.
[2] Bonbright, p. 373.
[3] Bonbright, p. 374.

shown to be current. Plaintiff Tocomo established the fair market value of its damaged goods before the fire in approximately the same manner. The witness Brown, an independent certified public accountant whose firm was employed by Tocomo's parent corporation, had supervised the inventory from which these estimates were taken. He introduced them into evidence and testified as to their authenticity. The inventory records in question had been compiled during the year of 1967, and had been periodically brought up to date by Brown himself, who had taken into account inventory turnover and change in value, if any. He stated that the records were current as of the 31st of December, 1967, 19 days before the fire. Tocomo's inventory was also figured at wholesale cost rather than retail value. Harry Deutsch, former secretary of Sav-Mart Corporation, testified as to the fair market value of Sav-Mart's inventory before the fire. His figures were also based upon current invoices from Sav-Mart's wholesale outlets, and were based upon the actual costs of the merchandise rather than retail value.

Regarding the calculation of the fair market value of the damaged property after the injury, Bonbright states that courts have allowed this to be proved by the testimony of witnesses as to the value after the fire, and that error is not committed in permitting a witness to state the value before the fire and then to state the percentage of depreciation resulting from the injury. The three plaintiffs in this case established the value of the goods after the fire by testimony of the witness Pulley, an expert witness with several years experience in estimating fire losses. Pulley testified that he had inspected the damage immediately after the fire and had submitted the percentage of depreciation for each damaged item. Pulley's valuation of the damaged inventory was conducted on behalf of the plaintiff's insurors who used his figures in their calculation of insurance recovery payable to the three plaintiffs.

■■ Error is contended in this case on the grounds that Pulley's testimony was based upon the subrogation receipts, which evidence the amount of insurance recovery by the plaintiffs. Defendants argue that since it is improper to use subrogation receipts as evidence for that purpose, there was insufficient proof of damages. We disagree. The record clearly shows that the subrogation receipts were admitted into evidence by stipulation of both parties for the limited purpose of proving the insuror's right of subrogation, and that the witness Pulley's testimony was based on his personal appraisal, not the subrogation receipts. In the case of *H. K. Porter Co. v. Halperin* (7th Cir. 1962), 297 F.2d 422, the court stated that, "If the damages to plaintiff's property for which defendant is liable are arrived at according to proper legal principles, it is of no significance that they may coincide with the amount paid plaintiff by

its insuror." We are convinced by the logic of this statement. Even though the appraisals were made in behalf of the insurors, and thus in large part determine the amount of insurance recovery as evidenced by the subrogation receipts, that should not render Pulley's testimony inadmissible in this litigation for the purpose of showing the amount of damages. The method adopted by plaintiff for showing compensable damages was fair, equitable, and in accordance with Illinois law. Moreover, it was absolutely uncontradicted on the record by defendants who introduced no evidence of their own on the issue of damages. Nor did they attempt to discredit the expertise or objectivity of Pulley.

■■■■ The second issue to be considered in this aspect of the case is whether the amount of damages in property injury cases ever becomes a question of law, and if so, whether the trial court in this case was justified in directing a verdict on the amount of damages. Neither counsel has cited a case in point, and our research has not disclosed any case where another court of review has considered whether the trial court was justified in directing a verdict on damages in an action where inventory was damaged by fire. The general rule among the states is that assessment of the amount of damages is ordinarily a question for the jury. (25A C.J.S., Damages, Sec. 176(2).) The discretion of the jury as to the amount of damages to be awarded, while very wide, is not an arbitrary or unlimited discretion. (22 Am.Jur.2d, Damages, Sec. 342.) This rule has been consistently adhered to in Illinois, and was most recently stated by the Illinios Supreme Court in *Flynn v. Vancil*, 41 Ill.2d 236, 240. We believe that although the question of the amount of damages is ordinarily best left to the jury, where the plaintiff offers substantial credible evidence to show the amount of his loss in damages to personal property and that evidence is both reasonable on its face and undisputed by the defendant, the trial court may be justified in directing a verdict on that evidence. We believe that this is such a case. Both directed verdicts, as to liability and as to amount of damages, were proper. They are thus affirmed.

Judgment affirmed.

EBERSPACHER and JONES, JJ., concur.