ERNEST CLAY *et al.*, Plaintiffs-Appellees, v. JACK DAVID BRODSKY, Defendant-Appellant (Richard Wolf Medical Instruments Corporation, Inc., Defendant).

Fourth District   No. 4—86—0098

Opinion filed October 6, 1986.

64

Richard F. Record, Jr., and Richard C. Hayden, both of Craig & Craig, of Mattoon, for appellant.

Phebus, Tummelson, Bryan & Knox, of Urbana (Joseph W. Phebus and Betsy Pendleton Wong, of counsel) for appellees.

JUSTICE SPITZ, delivered the opinion of the court:

Plaintiffs, Ernest and Gloria Clay, instituted this action in the circuit court of Champaign County, against physician, Jack David Brodsky, and medical equipment manufacturer, Richard Wolf Medical Instruments Corporation, Inc. (Wolf Medical). The Clays' amended complaint alleged alternative claims of *res ipsa loquitur* and specific negligence against defendant Brodsky. The complaint also set forth a products-liability claim directed against defendant Wolf Medical. The Clays sought to recover damages for a "wrongful pregnancy" allegedly resulting from an unsuccessful bilateral tubal ligation performed by Brodsky. The cause proceeded to trial by jury. At the conclusion of the trial, Brodsky's motion for a directed verdict was denied. Thereafter, the jury returned verdicts in favor of Wolf Medical and against Brodsky. The jury awarded damages to Gloria Clay in the amount of $75,000, and to Ernest Clay in the amount of $8,000. The trial court entered judgment on the verdicts. Brodsky's post-trial motion was thereafter denied. Brodsky now brings this appeal, asserting that: (1) the trial court erred in denying his motion for a directed verdict; (2) the jury's verdict was against the manifest weight of the evidence; (3) the trial court erred in allowing the admission of certain evidence; (4) the trial court erred in ruling on certain jury instructions; (5) the damage awards were excessive and the result of passion and prejudice; and (6) the trial court erred in refusing to grant his post-trial request for remittitur. For the reasons set forth below, the judgment of the circuit court is affirmed.

The following evidence was adduced at the October 7, 1985, jury trial in this cause. Ernest and Gloria Clay both testified to essentially

the same series of events. They stated that, in early 1980, Gloria decided to undergo a sterilization operation, due to her age and health. Gloria, 37 years old at that time, had previously delivered two children by cesarean section and had undergone gallbladder surgery. She consulted her obstetrician, defendant Brodsky, and he agreed to perform the sterilization procedure.

The Clays testified that on February 25, 1980, Gloria was admitted to the hospital and that evening Brodsky recommended the "Silastic band" method of sterilization. Brodsky performed Gloria's sterilization operation on February 26, 1980. Ernest Clay testified that he spoke with Brodsky following the operation and was informed that the procedure went smoothly, that there were no problems, and Gloria "was sterilized." According to the Clays, Brodsky did not advise them to use birth control, nor did he recommend follow-up tests to check the effectiveness of the sterilization operation.

The Clays testified that Gloria experienced no unusual problems the week following surgery and began to resume her normal activities. She thereafter smoked cigarettes, drank alcoholic beverages on occasion, and took diet pills. Then, sometime in late April or early May of 1980, Gloria began experiencing nausea, tiredness, and stomach cramps. Gloria contacted Brodsky who performed a pregnancy test that established Gloria was pregnant.

The Clays testified to experiencing concern about the health of the baby due to Gloria's age and her activities prior to learning she was pregnant. They were also concerned about Gloria's health. Gloria testified to a fear of operations and recurring dreams of dying in childbirth.

The Clays stated that during the first trimester of Gloria's pregnancy, she was anemic and experienced tiredness and nausea on a daily basis. Gloria indicated that for those reasons she was unable to maintain her normal work schedule. The Clays testified that during the second and third trimesters, Gloria gained a large amount of weight and encountered problems with swelling of her hands, arms, and feet. This interfered with her ability to get in and out of bed, dress herself, and put on shoes. She also developed pains in her arms and her back. In addition, Gloria testified that the baby, in utero, caused her extreme physical discomfort as it pressed against her rib cage and imposed pressure on her bladder.

The Clays stated that Dr. Bradley Adams delivered their baby by cesarean section on December 26, 1980. After the delivery Ernest spoke with Dr. Adams and was informed that the operation had gone well and that Gloria and the baby were healthy. According to the

Clays, Dr. Adams informed them that he had found three bands or rings in Gloria's pelvic area during the operation. Months later, Ernest picked up these bands from the hospital's pathology laboratory.

The Clays further testified that Gloria spent seven to eight days in the hospital following the delivery. After returning home, Gloria experienced pain in her rib cage and at the incision site and she was weak, depressed, and inactive. She stated that due to her physical and emotional state, she was unable to resume her normal work activities and her earnings decreased. She also stated that she was unable to resume her normal activities at home and required household help. For that reason, they employed a housekeeper, Pauline Maze, to work both before and after the birth of the child. She was paid approximately $300 to $350 per month for an estimated 19 months. Ernest testified that in addition to paying Maze's salary he incurred medical bills due to the sterilization procedure, pregnancy, and subsequent delivery.

Pauline Maze was called to testify by the Clays. In 1980, when Gloria learned she was pregnant, Maze was asked to work for the Clays on a full-time basis. Maze testified that she worked five days a week and her hours were from 8 a.m. to 3:30 or 4 p.m. She was in charge of the household duties and taking care of the children.

Maze observed Gloria's physical problems during the pregnancy and after the delivery. She testified that during pregnancy, Gloria was nauseated every morning and was unable to keep food down. She was aware of the swelling in Gloria's arms and legs. She was also aware of Gloria's weight gain and the pain she experienced in her back and side. She observed Gloria's difficulty with putting on shoes and clothing and in moving about during the latter part of her pregnancy. She also testified that, following the delivery, Gloria was weak, in pain, and had to stay in bed for a period of time. She stated that Gloria was unable to lift or take care of the baby for some time.

Andreen Butler was called to testify by the Clays. Butler stated that she had been a friend of the Clays for 13 to 14 years. She also stated that she had observed Gloria's physical problems during the pregnancy. She described Gloria's pregnancy as "really debilitating" and stated that she was aware of Gloria's problems with nausea, weight gain, back pain, swelling of the hands and feet, and difficulty in moving about. She testified that Gloria was fearful of operations and death in childbirth, and that she was depressed and lacked drive.

The Clays also called Dr. Bradley Adams to testify. Adams, an obstetrician and gynecologist, testified that he was a colleague of

Brodsky's and had known him for 20 years. Adams further testified that he provided prenatal care to Gloria and delivered her baby. He stated the Gloria was anemic during her "uneventful" pregnancy. In delivering the baby, Adams performed a cesarean section. Immediately thereafter, he performed a bilateral tubal ligation. In the course of the surgery he observed and removed from Gloria's pelvic area, three "small gray-white, ivory" bands. One band was located on Gloria's right fallopian tube "which looked occluded." Another band was "free in the pelvic area under the uterus." The third band was "attached to the omentum." He testified that the third band "adherent, or stuck to the omentum *** required a little teasing to *** remove it." He also testified that no band was found on the left fallopian tube which looked "entirely normal." He testified that he examined the entire length of the left tube and found no damage or scarring.

Dr. Gerald I. Zatuchni, a physician specializing in obstetrics and gynecology, testified as plaintiffs' expert witness. Zatuchni stated that he had performed several hundred Silastic band-type sterilization operations and had taught the procedure to other physicians. The Silastic band procedure used by Brodsky involves the application of a rubber-type band, called a "Lay loop Silastic band," to each fallopian tube with the use of a Lay loop applicator. Tongs on the applicator are used to grasp the midportion of the fallopian and pull it inside the hollow inner barrel of the applicator. The applicator's outer barrel then pushes the Silastic band down and around the knuckled midportion of the fallopian tube. If properly performed, the tube becomes immediately occluded, preventing the ovum from reaching the uterus and sterilization is achieved.

He testified that when a pregnancy occurs within weeks of the banding procedure, the most common reason for the failure is placement of the band on tissue or an organ, other than the fallopian tube, but that is similar in appearance. He also testified that a failure can occur when the band is improperly applied to the tube or is defective.

In his opinion, at the time of the sterilization procedure, Brodsky applied one band directly to the omentum tissue rather than to Gloria's left fallopian tube, a violation of the minimum standard of care. He stated that because Adams found the band embedded in the omentum, this signified that the band had been inadvertently placed there during the original sterilization operation. In his opinion, the band on the omentum could not have become attached to the tissue without surgical application. Zatuchni stated that the band was made of "Silastic," which is an inert material that does not cause any tissue reaction; in other words, the band will not adhere to tissue on its own. He

used the example of the band found floating free in Gloria's pelvic area and noted that it had not adhered to any tissue or organ on its own.

Finally, he testified that tests could be performed, subsequent to the sterilization operation, to verify that the tubes had been occluded, but that no such tests were performed here.

Dr. Glen Moore was called to testify as an expert witness by Brodsky's codefendant, the manufacturer of the Silastic bands. Dr. Moore, an obstetrician and gynecologist, testified that he had performed approximately 335 banding sterilization procedures. Based upon his experience and that of his colleagues, he believed that the Silastic bands were suitable, appropriate, and effective for sterilization procedures. In his opinion, a band, if properly applied, would remain on the fallopian tube. He stated that he had never experienced an occasion when a properly applied Lay loop Silastic band had come off of a fallopian tube.

Defendant, Jack David Brodsky, testified both as an adverse witness (Ill. Rev. Stat. 1985, ch. 110, par. 2—1102), and in his own behalf. Brodsky testified that on February 26, 1980, he performed a Silastic band sterilization procedure on Gloria Clay. This was the 13th such banding procedure he had performed.

In describing the procedure used in Gloria's operation, he stated that he applied a total of two bands, one to each of her fallopian tubes. He further stated that he reexamined each tube after he banded it and observed that there was a band properly in place on each tube. According to Brodsky, he did not use a third band in the procedure.

Following the sterilization procedure, Brodsky informed the Clays that the operation had proceeded "fairly uneventfully," and he encountered no difficulties. He stated that he did not recommend they use birth control. He described two techniques used to test the effectiveness of the sterilization procedure. He did not inform the Clays of the tests nor recommend them as he believed he "had no reason to" do so.

He testified that he had no knowledge why the left fallopian tube had not been banded successfully. He further testified that he had no idea how the third Silastic band came to be in Gloria's pelvic area. He denied placing the band on the omentum, indicating that there was a difference in appearance between the omentum and the fallopian tube.

Dr. Brodsky first contends that the trial court erred in denying his motion for a directed verdict at the conclusion of the trial, and further erred in denying his post-trial motion for judgment notwith-

standing the verdict. It is well established that a party is entitled to a directed verdict or a judgment *n.o.v.* only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand. *Mort v. Walter* (1983), 98 Ill. 2d 391, 396, 457 N.E.2d 18, 21; *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14.

Brodsky's primary contention is that the Clays' evidence was insufficient to establish a *prima facie* case of *res ipsa loquitur* and, thus, the trial court erred in submitting the case to the jury on that theory. Brodsky argues that the Clays presented no direct evidence of his negligence. Brodsky further argues that the testimony of Clays' expert was insufficient, as he had no personal knowledge of what occurred during the sterilization operation but could only testify as to what probably happened.

■ We believe that Brodsky misinterprets the application of the doctrine of *res ipsa loquitur*. The doctrine of *res ipsa loquitur* allows the trier of fact to draw an inference of negligence from circumstantial evidence when direct evidence of the cause of the injury is primarily within the knowledge and control of the defendant. (*Metz v. Central Illinois Electric & Gas Co.* (1965), 32 Ill. 2d 446, 207 N.E.2d 305; *Imig v. Beck* (1985), 137 Ill. App. 3d 631, 484 N.E.2d 796.) A plaintiff, to avail himself of the doctrine, must demonstrate that he was injured: " '(1) in an occurrence that ordinarily does not happen in the absence of negligence, (2) by an agency or instrumentality within the defendant's exclusive control, and (3) under circumstances indicating that the injury was not due to any voluntary act or neglect on the part of the plaintiff ***.' 3 J. Dooley, Modern Tort Law sec. 48.02 (1977)." (*Spidle v. Steward* (1980), 79 Ill. 2d 1, 5-6, 402 N.E.2d 216, 218; *McMillen v. Carlinville Area Hospital* (1983), 114 Ill. App. 3d 732, 736, 450 N.E.2d 5, 9.) The burden is on the plaintiff to make out a *prima facie* case of all the elements. To determine whether the Clays' evidence established a *prima facie* case for *res ipsa loquitur*, we may examine the record as a whole. *Spidle v. Steward* (1980), 79 Ill. 2d 1, 402 N.E.2d 216; *Thompson v. Lietz* (1981), 95 Ill. App. 3d 384, 420 N.E.2d 232.

■ Regarding element (1), it was uncontroverted that Brodsky performed Gloria's sterilization operation and that she became pregnant shortly thereafter. The Clays' expert witness, Dr. Zatuchni, testified that a pregnancy does not ordinarily occur so soon after a sterilization operation in the absence of negligence. Testimony was presented regarding the reliability and effectiveness of a properly per-

formed banding sterilization. One witness also testified that the particular bands used did not appear to be defective. Evidence was also presented with respect to element (2), that the injury was caused by an agency or instrumentality within Brodsky's exclusive control. Zatuchni testified that where, as here, a pregnancy occurs several weeks after a banding sterilization operation, either the band was applied to an organ or tissue other than a fallopian tube, the band was applied to the fallopian tube improperly, or the band was defective. With respect to Gloria's case, Zatuchni believed that Brodsky applied a band directly to the omentum tissue, rather than her left fallopian tube. He believed it was significant that her obstetrician found no band on the unscarred, left fallopian tube, but instead found one band floating free in the pelvic area and another band attached to the omentum. Finally, as pertains to element (3), there was testimony that the Clays, particularly Gloria Clay, could not have in any way contributed to the cause of the failed sterilization operation. We conclude that from all of the evidence, viewed in a light most favorable to the Clays, the jury could have decided that each of the elements for *res ipsa loquitur* was proved. Accordingly, we cannot say that this evidence so overwhelmingly favors defendant Brodsky, that no verdict in the Clays' favor could ever stand. *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504; *Spidle v. Steward* (1980), 79 Ill. 2d 1, 402 N.E.2d 216.

■ It is true, as Brodsky argues, that some of the testimony was controverted. In particular, Brodsky denied placing a band on the omentum or doing anything improper in the performance of the sterilization procedure. Nevertheless, factual disputes presenting credibility questions or requiring evidence to be weighed should not be decided by the trial judge as a matter of law, but are to be resolved by the jury. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504.) Therefore, the trial court did not err in denying Brodsky's motions for a directed verdict or for a judgment *n.o.v.*

■ Brodsky's second contention is that the jury's verdict was against the manifest weight of the evidence and, thus, his request for a new trial was erroneously denied. When considering whether a verdict was contrary to the manifest weight of the evidence, a reviewing court must view the evidence in the light most favorable to the appellee. *Kemper v. McDougal-Hartmann Co.* (1984), 127 Ill. App. 3d 512, 468 N.E.2d 998.

■ As we have just determined, the Clays' evidence established a *prima facie* case for *res ipsa loquitur*. That evidence, if believed, permitted the trier of fact to draw an inference of Brodsky's negligence.

(*Spidle v. Steward* (1980), 79 Ill. 2d 1, 402 N.E.2d 216.) Once this was accomplished, the burden shifted to Brodsky to explain. (*Edgar County Bank & Trust Co. v. Paris Hospital, Inc.* (1974), 57 Ill. 2d 298, 312 N.E.2d 259; *McMillen v. Carlinville Area Hospital* (1983), 114 Ill. App. 3d 732, 450 N.E.2d 5.) It was for the trier of fact to weigh the evidence and determine whether the circumstantial evidence of negligence was overcome by the defendant's proof. *Metz v. Central Illinois Electric & Gas Co.* (1965), 32 Ill. 2d 446, 207 N.E.2d 305; *Imig v. Beck* (1985), 137 Ill. App. 3d 631, 484 N.E.2d 796.

Here, Brodsky offered no explanation to suggest a theory of causation for the failed sterilization, not involving his own negligence. (*Collgood, Inc. v. Sands Drug Co.* (1972), 5 Ill. App. 3d 910, 284 N.E.2d 406; *Erckman v. Northern Illinois Gas Co.* (1965), 61 Ill. App. 2d 137, 210 N.E.2d 42.) The combined testimony of Drs. Zatuchni and Adams weighed heavily against defendant Brodsky. Specifically, we note that Adams testified that: (1) three Silastic bands instead of two were found in Gloria's abdomen; (2) Gloria's right fallopian tube was banded and looked blocked or occluded but that no band was found on the undamaged left tube; (3) a second band was found floating free in the pelvic area; and (4) a third was found attached to the omentum. In the face of this testimony, Brodsky stated that he had no idea where the third band came from. Nor did he know of any reason that there was no band on the left fallopian tube.

In view of the foregoing, and based upon our review of the evidence in the light most favorable to the Clays, we are unable to say that the jury's verdict was overwhelmingly contrary to the evidence or against its manifest weight. *Mizowek v. De Franco* (1976), 64 Ill. 2d 303, 356 N.E.2d 32; *Carman v. Dippold* (1978), 63 Ill. App. 3d 419, 379 N.E.2d 1365.

Brodsky's third contention is that the trial court erred in admitting certain evidence, which operated to deny defendant a fair trial.

First, Brodsky argues that the testimony of Dr. Glen Moore, the codefendant's expert witness, was inadmissible against him. Specifically, Brodsky points to Dr. Moore's testimony regarding: (1) his experience and success with the Silastic band method of sterilization, and that of his colleagues; (2) his description of the actual banding procedure; and (3) the average time involved in the performance of such a procedure. Brodsky asserts that the trial court's refusal to give a limiting instruction regarding this testimony constitutes reversible error.

The Clays contend that the limiting instruction was properly refused as Moore's testimony was probative of issues pertaining to

Brodsky's negligence. The Clays also contend that, in any event, this testimony was cumulative of other testimony presented and Brodsky has failed to demonstrate that he was prejudiced thereby. We agree.

The decision of whether or not to give a cautionary instruction is a matter within the sound discretion of the trial court. (See *Donk Brothers Coal & Coke Co. v. Thil* (1907), 228 Ill. 233, 244, 81 N.E. 857, 861; *Tuttle v. Fruehauf Division of Fruehauf Corp.* (1984), 122 Ill. App. 3d 835, 844, 462 N.E.2d 645, 653.) A reviewing court will not disturb the trial court's decision unless prejudice has resulted. (*Malek v. Lederle Laboratories* (1984), 125 Ill. 3d 870, 466 N.E.2d 1038.) The party asserting error must demonstrate how he was prejudiced, and absent a clear showing of prejudice, it will not be assumed by a court of review. (*Kyowski v. Burns* (1979), 70 Ill. App. 3d 1009, 388 N.E.2d 770; *O'Brien v. Walker* (1977), 49 Ill. App. 3d 940, 364 N.E.2d 533.) Brodsky has made no showing that he was prejudiced by the absence of a limiting instruction. Moreover, from our review of the record, we cannot say that it unduly affected the outcome below. Rather, this testimony was largely cumulative of other evidence presented. Thus, under the circumstances here, the trial court's refusal to give a limiting instruction does not constitute reversible error.

■ Next, Brodsky argues that the admission of the three Silastic bands, purportedly removed from Gloria Clay's abdomen at the time of the delivery by Dr. Adams, was reversible error. It is Brodsky's position that the foundation for the admission of these bands was insufficient.

Based upon our review of the record, we cannot say that the trial court's admission of the Silastic bands was error. A lengthy discussion along these lines is unnecessary here, however, as Brodsky has failed to show prejudice or that this evidence materially affected the outcome below. Error in the admission of evidence does not require reversal when there has been no prejudice or if the evidence does not materially affect the outcome. (*Pagel v. Yates* (1984), 128 Ill. App. 3d 897, 471 N.E.2d 946.) The Clays' evidence, apart from the Silastic bands in question, was sufficient to establish the elements of *res ipsa loquitur*. The testimony of the witnesses pertaining to Brodsky was not dependent upon these bands. We do not believe that the admission of the bands materially affected the outcome. Moreover, Brodsky has made no showing, nor do we believe that he was unfairly prejudiced by, the admission of this evidence. Thus, error, if any, in the admission of the Silastic bands would not warrant reversal here.

■■ ■ Last, Brodsky argues that the testimony of Andreen Butler, the Clays' acquaintance, and that of Pauline Maze, the Clays'

housekeeper, was unduly prejudicial. He contends that the trial court's failure to exclude this testimony in its entirety was reversible error. We disagree.

This testimony was relevant to the issue of damages, and we can find nothing in the manner in which it was presented which unduly prejudiced Brodsky. (See *Ogg v. City of Springfield* (1984), 121 Ill. App. 3d 25, 458 N.E.2d 1331.) Moreover, the facts testified to were strongly established by other competent evidence. (See *St. Gemme v. Tomlin* (1983), 118 Ill. App. 3d 766, 455 N.E.2d 294.) At any rate, Brodsky has waived any error in this regard by failing to make proper and timely objections.

We note that Brodsky made no motion *in limine* as to the testimony of either witness. Further, he failed to make any objection to the testimony of Maze at trial. The failure to make a timely objection waives the objection, and it cannot later be raised on appeal. (*Tolbird v. Howard* (1969), 43 Ill. 2d 357, 253 N.E.2d 444; *Zorn v. Zorn* (1984), 126 Ill. App. 3d 258, 464 N.E.2d 879.) The only two objections made during Butler's testimony were on hearsay grounds, one of which was sustained. Nothing was mentioned about relevance, unfair prejudice, or the exclusion of the testimony in its entirety. It is well established that an objection must specify the grounds for the objection and no grounds other than those stated will be considered on appeal. (*Johns-Manville Products Corp. v. Industrial Com.* (1979), 78 Ill. 2d 171, 399 N.E.2d 606.) Thus, Brodsky has waived this issue.

■■■ Brodsky next contends that the trial court erred in giving the following instructions on the issue of damages:

> "If you decide for Plaintiff Gloria Clay on the question of liability, you must then fix the amount of money which will reasonably and fairly compensate her for any of the following elements of damage proved by the evidence to have resulted from the negligence of the defendant:
>
> The pain and suffering experienced as a result of the pregnancy.
>
> The disability and disfigurement resulting from the pregnancy.
>
> The value of earnings lost as a result of the pregnancy.
>              * * *
>
> If you decide for Plaintiff Ernest Clay on the question of liability, you must then fix the amount of money which will reasonably and fairly compensate him for any of the following elements of damage proved by the evidence to have resulted from the negligence of the defendant:

The reasonable expense of necessary medical care, treatment and services received by Gloria Clay, his wife, as a result of her pregnancy.

The reasonable expense of necessary help in their home, which has been required as a result of the pregnancy."

Brodsky argues that the Clays were entitled to recover damages caused by the actual delivery, but were not entitled to recover damages caused by the pregnancy. We do not agree.

As indicated at the onset, the Clays' amended complaint set forth a claim for damages based upon wrongful pregnancy. Illinois courts recognize a limited cause of action for "wrongful pregnancy," where "the alleged injury to the parent is the birth of the unplanned or unwanted, but usually normal and healthy, child, resulting from the negligence of a doctor or other health care provider in performing an abortion, sterilization, or in filling a prescription for contraceptives." (See *Siemieniec v. Lutheran General Hospital* (1985), 134 Ill. App. 3d 823, 826, 480 N.E.2d 1227, 1229, *appeal allowed* (1985), 108 Ill. 2d 589; see also *Wilczynski v. Goodman* (1979), 73 Ill. App. 3d 51, 391 N.E.2d 479; *Cockrum v. Baumgartner* (1983), 95 Ill. 2d 193, 447 N.E.2d 385, *cert. denied* (1983), 464 U.S. 846, 78 L. Ed. 2d 139, 104 S. Ct. 149.) If the allegations of negligence are proved in such an action, the tortfeasor is liable for "damages limited to pregnancy and birth related costs, expenses, and such associated elements of personal injury action as [was] pleaded." *Wilczynski v. Goodman* (1979), 73 Ill. App. 3d 51, 63, 391 N.E.2d 479, 488.

The *Wilczynski* court, on public policy grounds, refused to recognize as compensable damage the "additional costs and expenses necessary to sustain and nurture [the healthy child] once it comes to fruition upon and after successful birth." (73 Ill. App. 3d 51, 62, 391 N.E.2d 479, 487.) However, the court rejected the argument that costs and expenses of pregnancy and birth should not be compensable, stating:

"Damages based upon hospital and medical costs attending plaintiff's unwanted pregnancy, as they affect her person, have little to do with the child's right to life and its concomitant expense of upbringing and education. The practical effect of such a position would allow tortious conduct by a medical practitioner in such cases to be totally uncompensable. Further, unwarranted immunity would thereby be extended to the medical profession if damages ensuing from improper treatment were to be denied." 73 Ill. App. 3d 51, 63, 391 N.E.2d 479, 488.

This case was subsequently cited with approval by the supreme

court in *Cockrum v. Baumgartner* (1983), 95 Ill. 2d 193, 201, 447 N.E.2d 385, 389. In *Cockrum*, the court held that the costs of rearing a normal healthy child cannot be recovered as damages to parents in wrongful-pregnancy actions. While the court was not called upon, nor did it discuss the other damages sought by the parents (*i.e.*, pain of childbirth, the time lost in having the child, and the medical expenses involved), the court pointed out that courts in the majority of States "have generally held that in such actions the infant's parents may recover for the expenses of the unsuccessful operation, the pain and suffering involved, any medical complications caused by the pregnancy, the costs of delivery, lost wages, and loss of consortium." 95 Ill. 2d 193, 196, 447 N.E.2d 385, 387.

In view of our foregoing discussion, we conclude that the instructions given here were proper. The damages sought were only those caused by the pregnancy, which the Clays were entitled to recover, upon a finding that Brodsky was negligent. *Wilczynski v. Goodman* (1979), 73 Ill. App. 3d 51, 391 N.E.2d 479.

▇▇ Brodsky's remaining contentions involve the damage awards. Brodsky contends that the damages awarded were excessive and the result of passion and prejudice. He, therefore, requests this court to order a new trial or enter a remittitur. The ascertainment and assessment of damages are questions of fact peculiarly within the province of the jury. (*Long v. Yellow Cab Co.* (1985), 137 Ill. App. 3d 324, 484 N.E.2d 830; *Carter v. Chicago & Illinois Midland Ry. Co.* (1985), 130 Ill. App. 3d 431, 474 N.E.2d 458.) Reviewing courts must be reluctant to interfere with the discretion of the jury (*Flynn v. Vancil* (1968), 41 Ill. 2d 236, 242 N.E.2d 237), and the determination of damages will not be disturbed on appeal unless it is obviously the result of passion or prejudice, or is clearly excessive. (*Jones v. Karraker* (1983), 98 Ill. 2d 487, 457 N.E.2d 23; *Hubbard v. Logsdon* (1978), 56 Ill. App. 3d 366, 372 N.E.2d 101.) An award is considered excessive if it falls outside the necessarily flexible limits of fair and reasonable compensation or is so large as to shock the judicial conscience. *Kosch v. Monroe* (1982), 104 Ill. App. 3d 1085, 433 N.E.2d 1062.

▇▇ We believe that the $75,000 award to Gloria was within the realm of fair and reasonable compensation in light of the evidence presented with respect to damages resulting from the failed sterilization, pregnancy, and delivery. Testimony was presented regarding the physical problems, pain, and considerable discomfort Gloria experienced. The record also indicated that her normal household, work, and social activities were curtailed and restricted. In addition, Gloria's testimony established, with a fair degree of probability, a basis for the

assessment of loss of income. (*Schatz v. Abbott Laboratories, Inc.* (1972), 51 Ill. 2d 143, 281 N.E.2d 323; *Tracy v. Village of Lombard* (1983), 116 Ill. App. 3d 563, 451 N.E.2d 992.) We also believe that the $8,000 award to Ernest Clay was within the range of reasonable compensation. Uncontroverted evidence established that he incurred medical bills totalling $2,668.51, which resulted from his wife's pregnancy and the subsequent delivery. Further, due to the physical problems Gloria encountered, household help was required for up to 19 months. The record indicated that Ernest incurred the cost of the housekeeper's salary, who was paid $300 to $350 per month.

On the record before us, we cannot say that the damage awards are so palpably excessive as to indicate passion or prejudice on the part of the jury. Nor are they so large as to shock judicial conscience. Accordingly, the award of a new trial or entry of a remittitur is not justified here.

For the reasons stated, the judgment of the circuit court of Champaign County is affirmed.

Affirmed.

GREEN and MORTHLAND, JJ., concur.