ERICA HENRY, by her Mother and Next Friend, Jane Henry, Plaintiff-Appellee, v. ST. JOHN'S HOSPITAL et al., Defendants-Appellants, and (Breon Laboratories, Inc., et al., Defendants-Appellees; Thomas O'Hern, Defendant).

Fourth District  No. 4—86—0604

Opinion filed August 24, 1987.—Modified on denial of rehearing September 29, 1987.

726

Graham & Graham, of Springfield (Richard J. Wilderson, of counsel), for appellants.

Cook, Shevlin & Keefe, Ltd., of Belleville, and Leo F. Carroll, of Jacksonville (Bruce N. Cook, of counsel), for appellee Erica Henry.

JUSTICE McCULLOUGH delivered the opinion of the court:

Defendants St. John's Hospital and Dr. Shari Fitzgerald (St. John's-Fitzgerald) appeal a jury finding in plaintiff's favor in her medical malpractice action. St. John's-Fitzgerald argues the trial court erred: in its rulings on directed verdict and judgment notwithstanding the verdict with regard to them; in denying St. John's-Fitzgerald's motion to dismiss a counterclaim; in denying St. John's-Fitzgerald's motion to file a counterclaim; and in instructing the jury. St. John's-Fitzgerald also argues the compensatory damages award was excessive.

We affirm.

The genesis of this action is a medical malpractice-products liability claim brought by plaintiff, a minor. Plaintiff has cerebral palsy. Prior to her birth, her mother was given two paracervical blocks using the drug Marcaine (bupivacaine). The first paracervical block was administered by her physician, Dr. Thomas O'Hern. The second paracervical block was administered by a hospital resident, Fitzgerald. Immediately after administration of the second paracervical block, plaintiff suffered an episode of bradycardia (abnormally slow fetal heartbeat), which lasted until her birth. Plaintiff sued O'Hern, Fitzgerald, the manufacturer and distributor of Marcaine, and St. John's Hospital on a theory of *respondeat superior*.

The trial court directed a verdict in favor of O'Hern. The court found as a matter of law that Fitzgerald and thus, St. John's Hospital, violated the standard of care and directed a verdict as to that issue. The court left open the causation issue. The jury returned a verdict against the resident, the hospital, the manufacturer of the drug, and the distributor of the drug. It assessed $10 million in compensatory damages. The compensatory damages award was apportioned between the parties, with St. John's-Fitzgerald responsible for 7% of the award. Subsequently, the trial court reduced the medical expenses portion of the compensatory damages award to $11,759. The products liability defendants settled. Only the facts necessary to a determination of the issues raised by St. John's-Fitzgerald will be addressed.

Plaintiff's mother, Jane Henry, entered St. John's Hospital for the induction of labor. Her pregnancy had been uncomplicated; however, O'Hern testified that he was concerned she might reach a post-mature state. O'Hern attached an external fetal monitor, which showed a good fetal heart variability and rate. He then started a drug to induce labor. At 10:30 a.m., O'Hern attached an internal fetal monitor and administered 8 cc's of Marcaine bilaterally at the 3 o'clock and 9 o'clock positions. After completing the paracervical block, he observed

the fetal heart monitor for 15 minutes, during which time the fetal heart rate and beat variability were unchanged. O'Hern left and went to his office.

Jane Henry testified the paracervical block provided some relief but the relief lasted only 10 to 15 minutes. Fitzgerald administered the second block. Fitzgerald testified that she was a first-year resident at St. John's Hospital doing her first rotation in obstetrics when she administered a second paracervical block to Jane Henry at 11 a.m. It took her 10 minutes to complete the procedure, which she performed using a method she had been taught. She injected 6 cc's of Marcaine on the left side, and although she filled the syringe to 4 to 5 cc's for the right side, she lost a lot of the drug prior to injection.

O'Hern was called back to the hospital and told bradycardia had developed. Plaintiff, Erica, had lapsed into severe bradycardia for at least five minutes prior to O'Hern's return. Bradycardia is evidence of fetal distress. If sudden and prolonged, it may be evidence of fetal asphyxia. Additionally, bradycardia can cause asphyxia.

O'Hern was told that a repeat block had been given at 11:10 a.m. O'Hern stated that he had seldom seen severe bradycardia but the effect of anesthesia is dose-related. The labor flow charts indicated that Jane Henry was given an additional 6 cc's of Marcaine per side. He did not authorize the second block and would not have administered 6 cc's per side in addition to the previous dosage within 30 minutes of the initial dose. O'Hern stated that he would not have given a repeat block on both sides because the nursing notes indicate that the patient complained of pain only on her left side. However, the determination of when a repeat block is necessary is a matter of judgment, and one may be appropriate within 30 minutes.

O'Hern further stated it is not acceptable practice in the Springfield medical community for a second paracervical block to be given without authorization from the attending physician. O'Hern admitted wide variations in maximum dosage amounts are recommended in medical literature.

Dr. John Marty, a partner of Dr. O'Hern who had also treated Jane Henry, stated only the attending physician has the authority to authorize a repeated paracervical block. He would wait 90 minutes prior to repeating the block. Neither O'Hern nor Marty authorized the second paracervical block. It was not accepted medical practice for a repeat block to be given within one-half hour of the first paracervical block, absent authorization. After the first block in the instant case, the fetal heart rate was good. Thirteen and one-half minutes after the second block, the fetal heart rate dropped drastically, and fetal heart-

beat variability decreased markedly. Marty testified that the bradycardia occurred precisely where he would expect it to occur if it were from the Marcaine.

Michael Gast, a board-certified obstetrician, testified for the drug company and distributor. In his opinion, it was below the standard of care for a resident to administer a paracervical block absent prior consultation with a senior physician. He also questioned the method and amount of Marcaine given during the second paracervical block.

Ernest Ertmoed, the chief obstetrical resident at St. John's Hospital and a clinical assistant professor, testified that a reblock would be equal to a full dosage of Marcaine, between 8 and 10 cc's on each side. A supplemental paracervical block would be a few cc's of Marcaine, usually no more than one-half of the first dosage given. While it would be unusual for a resident to administer a full reblock without consultation, it is not unusual for residents to administer supplemental paracervical blocks without prior consultation with the attending physician.

Ertmoed further testified that it was in accord with the standard of care for a resident physician in Springfield to give a supplemental paracervical block of up to one-half of the original dosage absent prior authorization. He admitted, however, that more than one-half of the original does was given in the instant case.

Fitzgerald testified that she did not talk to O'Hern prior to administering the second paracervical block. She agreed that nursing notes stated she gave 6 cc's of Marcaine on each side. After plaintiff's birth, Fitzgerald amended the nursing notes to show a lesser dosage. Ordinarily, a physician does not write on the labor flow chart or amend nursing notes.

Erica Henry, plaintiff, was not breathing when born and was placed in a high-risk nursery. She remained in the nursery for several days. Dr. Thomas Cisezk, a board-certified pediatrician and neonatologist, discussed the possibility of long-term neurological damage with Erica's parents, prior to her discharge. Cisezk stated that based upon Erica's condition immediately after birth, she suffered a period of oxygen deprivation and respiratory distress secondary to asphyxia. There is no specific test performable immediately after birth which will relate whether an infant has suffered brain damage. At 24 months, Erica was diagnosed as having severe cerebral palsy and psychomotor retardation because of severe asphyxia.

Cisezk stated that Erica has permanent neurological damage. Based on a reasonable degree of medical certainty, it is likely that the perinatal asphyxia was related to the bradycardia prior to delivery.

The asphyxia, absent a predisposition for cerebral palsy, was likely related to the developmental delay. Erica will require future long-term care.

Suzanne Miller, a board-certified pediatrician and neurologist, examined and treated Erica. Her preliminary diagnosis was that Erica suffered static encephalopathy (cerebral palsy) due to perinatal hypoxia. Static encephalopathy implies that a single insult occurred at a specific time which led to the child not receiving full neurological function. Miller did not believe any evidence of congenital brain malfunction existed. She suspected the second paracervical block caused the injury, but admitted that she was speculating because she had not examined the child immediately after her birth.

O'Hern testified that it was reasonably likely the bradycardia was related to the second paracervical block. The depressed state of the child at birth was very likely related to the bradycardia. The fetus showed no signs of distress until after the second paracervical block. Marty testified that after the first paracervical block, the fetal heart monitor tracing showed good beat and beat variability, which indicated an intact central nervous system. After the second paracervical block, the beat and beat variability dropped, indicating fetal asphyxia.

Ira Bergman, a board-certified pediatrician and neurologist, stated that in his opinion the events surrounding Erica's birth did not cause her cerebral palsy. He believed the cerebral palsy was a congenital problem with neurons. Gast stated residents frequently give paracervical blocks and depending on the level of the resident, on occasion give them without specific authorization. No more than 50 mg's of Marcaine should be given in a 90-minute period. Gast admitted that if Fitzgerald started the second paracervical block and finished it at 11:10, the heart tracing showed the onset of bradycardia in a time frame in which he would expect it if caused by the Marcaine.

The parties produced extensive testimony concerning the adequacy of the warning about Marcaine's hazards.

Initially, St. John's-Fitzgerald argues that the trial court erred in directing a verdict against it on the issue of negligence. Defendant argues that controverted issues of fact exist as to the appropriate time, dosage, and technique of administration of the second paracervical block. Defendant contends plaintiff failed to establish a standard of care or violation of the standard of care with regard to Fitzgerald's conduct. Secondly, St. John's-Fitzgerald argues that a conflict exists as to Fitzgerald's authority to administer the second paracervical block. The plaintiff argues that the testimony showed Fitzgerald administered too much Marcaine, too soon, with a faulty technique, and

without authority.

■■ ■ A directed verdict or judgment notwithstanding the verdict is proper only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand. (*Borowski v. Von Solbrig* (1975), 60 Ill. 2d 418, 423, 328 N.E.2d 301, 305; *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504; *Lebrecht v. Tuli* (1985), 130 Ill. App. 3d 457, 473 N.E.2d 1322.) In medical negligence actions, plaintiff must establish the appropriate standard of care. Then, plaintiff must establish by affirmative evidence that defendant's conduct violated that standard of care and that defendant's lack of skill or care caused harm to plaintiff. (*Walski v. Tiesenga* (1978), 72 Ill. 2d 249, 256, 381 N.E.2d 279, 282.) Expert testimony is usually needed to establish these elements; however, a defendant doctor's testimony may be used to establish these elements. *Metz v. Fairbury Hospital* (1983), 118 Ill. App. 3d 1093, 455 N.E.2d 1096.

■ In the instant case, the record supports St. John's-Fitzgerald's contention that the standard of care and Fitzgerald's violation of the standard of care were not established as to the time of administration, dosage amount, and technique. However, O'Hern, Marty, and Gast stated that it was a violation of the standard of care for a resident to administer a repeat block without consultation with the attending or a more senior physician. It is not disputed that Fitzgerald gave more than a supplemental paracervical block in the instant case. Gast admitted that residents do administer paracervical blocks. However, he felt consultation was necessary prior to administering this dosage of Marcaine. Ertmoed stated that administration of a supplemental block by a resident without prior authorization was customary and complied with the standard of care. However, he defined a supplemental block as one containing up to one-half of the initial dosage and admitted that Fitzgerald administered more than a supplemental dosage in the instant case.

Considering the evidence most favorable to Fitzgerald, all of the expert testimony stated her conduct was contrary to the standard of care. St. John's Hospital's liability was predicated on the employment relationship between it and Fitzgerald. Therefore, the trial court was correct in entering a directed verdict on this issue.

■ St. John's-Fitzgerald next argues that the trial court erred in denying its motion for directed verdict at the close of plaintiff's case. It argues plaintiff failed to present any evidence that Fitzgerald's actions caused the bradycardia, resultant hypoxia, and injury.

Plaintiff has the burden of proving that defendant's actions more probably than not caused the injury. (*Eberle v. Brenner* (1985), 131 Ill. App. 3d 394, 475 N.E.2d 639.) A brief review of the evidence is necessary. Cisezk testified that plaintiff suffered oxygen deprivation and respiratory distress, secondary to asphyxia. Absent predisposition, he believed to a reasonable degree of medical certainty that it was likely that the asphyxia was related to the bradycardia. Miller stated that she suspected the second block caused the difficulty, but admitted that since she had not examined the child her opinion was somewhat speculative. O'Hern testified that it was reasonably likely that the bradycardia was related to the second paracervical block. Marty testified that the fetus was in fine condition until the second block. Gast and Bergman testified that the bradycardia was principally caused by post-maturity and umbilical cord compression. However, Gast admitted that the bradycardia started precisely where he would expect it to start if caused by the Marcaine, and drug intoxication and side effects are dose-related. The question in the instant case is one of proximate causation. A conflict in expert testimony on this issue appears. Therefore, directed verdict was properly denied.

■ St. John's-Fitzgerald argues that the trial court erred in denying its motion for judgment notwithstanding the verdict on the above issues. The standard of review in determining the propriety of a directed verdict is the same as that for determining the propriety of a judgment notwithstanding the verdict. No error occurred in the instant case.

■ St. John's-Fitzgerald next argues that the trial court erred in not striking the products liability defendants' counterclaims against it, in denying its motion to file a counterclaim for contribution against them, and in instructing the jury. As affirmative defenses, the products liability defendants alleged plaintiff's injuries were also caused by the conduct of other people. They alleged in a counterclaim that Fitzgerald negligently administered the second paracervical block, assumed the risk of using Marcaine, and misused the drug. After the close of the evidence, St. John's-Fitzgerald moved to file a contribution counterclaim against the drug manufacturer and distributor. The court denied the motion as untimely.

St. John's-Fitzgerald argues assumption of the risk is not a valid defense in a failure to adequately warn products liability case since one cannot assume an unknown risk, the trial court erred in failing to dismiss the claim for failure to state a cause of action, and a party who is engaged in wilful and wanton behavior should not be able to seek contribution.

The contentions raised by St. John's-Fitzgerald were recently addressed in *J. I. Case Co. v. McCartin-McAuliffe Plumbing & Heating, Inc.* (1987), 118 Ill. 2d 447. The court found that principles of assumption of the risk and misuse do not readily fit within the context of contribution. The operative consideration is the negligence of the codefendant. Here, the counterclaims included allegations of negligence, assumption of the risk, and misuse as a basis of contribution. The trial court did not err in denying the motion to dismiss.

■■ ■ St. John's-Fitzgerald argues the trial court erred in denying its motion to file a counterclaim for contribution against the drug manufacturer and distributor. The motion was made after the close of all evidence and prior to the instruction conference. The allowance of a motion to amend a pleading is addressed to the sound discretion of the trial court. (*Taylor v. City of Beardstown* (1986), 142 Ill. App. 3d 584, 491 N.E.2d 803; *Morris v. City of Chicago* (1985), 130 Ill. App. 3d 740, 474 N.E.2d 1274.) Amendments during trial should not ordinarily be permitted if the amendments concern matters which the pleader knew of at the time of the original pleading. The prejudice and surprise of the other party should also be considered. 130 Ill. App. 3d 740, 474 N.E.2d 1274.

■■ Here, the amendment raised a new issue after the parties had rested their cases. The drug manufacturer and distributor would not have had an opportunity to present evidence rebutting the issues raised in St. John's-Fitzgerald's proposed contribution counterclaim. St. John's-Fitzgerald knew of a possible contribution action throughout. We find that the trial court did not abuse its discretion in denying the motion, as it was not raised in a timely fashion.

■■ The verdict form in the instant case did not contain a separate finding on the contribution counterclaim of the drug manufacturer and distributor. St. John's-Fitzgerald argues this was error. We do not agree. It is only when the comparative negligence of plaintiff and the contribution counterclaims among defendants are raised in the same cause and the jury must return separate verdicts on the claims. See generally *Ogg v. Coast Catamaran Corp.* (1986), 141 Ill. App. 3d 383, 490 N.E.2d 111.

■■ Finally, St. John's-Fitzgerald argues the jury's verdict was influenced by passion and prejudice and was so large as to shock the conscience of the court. The ascertainment and assessment of damages are questions of fact peculiarly within the province of the jury. Reviewing courts must be reluctant to interfere with the discretion of the jury, and the determination of damages will not be disturbed on appeal unless it is obviously the result of passion or prejudice, or is

clearly excessive. An award is considered excessive if it falls outside the necessarily flexible limits of fair and reasonable compensation or is so large as to shock judicial conscience. (*Clay v. Brodsky* (1986), 148 Ill. App. 3d 63, 499 N.E.2d 68; *Ludgin v. John Hancock Mutual Life Insurance Co.* (1986), 145 Ill. App. 3d 703, 495 N.E.2d 1237.) A precise dollar amount of compensation for pain and suffering or permanent disability is not necessarily related to the amount of medical expenses. Medical bills are not conclusive as to the appropriate size of a verdict. (*Ludgin v. John Hancock Mutual Life Insurance Co.* (1986), 145 Ill. App. 3d 703, 495 N.E.2d 1237.) Considering the nature of the injuries in the instant case, we cannot say that the damages award is so large as to shock judicial conscience. Therefore, we affirm the jury verdict less the court-ordered remittitur as to medical expenses and affirm St. John's-Fitzgerald's responsibility for 7% thereof.

For the above reasons, we affirm the trial court.

Affirmed.

SPITZ, P.J., and GREEN, J., concur.